Filed 5/8/15

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| KIMBERLI HIRST,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CITY OF OCEANSIDE,<br><br>    Defendant and Appellant. | D064549<br><br><br><br>(Super. Ct. No. 37-2010-00101050-CU-PO-NC) |

APPEAL from an order of the Superior Court of San Diego County, Jacqueline M. Stern, Judge.  Affirmed.

Ritter & Associates, Dwight Ritter and Karen Albence, for Plaintiff and Respondent.

John Mullen, City Attorney, Deborah L. Nash, Assistant City Attorney; Greines, Martin, Stein & Richland, Timothy T. Coates and Alana H. Rotter, for Defendant and Appellant.

Kimberli Hirst, an employee of American Forensic Nurses, Inc. (AFN), brought a Fair Employment and Housing Act (FEHA) claim against the City of Oceanside (City),

alleging she was sexually harassed by an Oceanside police officer, Gilbert Garcia, while she was providing phlebotomist services on behalf of the Oceanside Police Department. The jury found Hirst proved her claim and awarded her $1.5 million in damages against the City. After reducing the amount for which Garcia was found responsible, the court entered judgment in Hirst's favor for $1.125 million.

The City moved for a new trial and for a judgment notwithstanding the verdict (JNOV). In the new trial motion, the City contended the damages award was unsupported by the evidence. In the JNOV motion, the City argued Hirst was not entitled to recover under the FEHA because she was not a City employee, special employee, or a "person providing services pursuant to a contract" under Government Code section 12940, subdivision (j)(1).[1]

The court denied the JNOV motion, but granted the new trial motion finding the damage award was excessive. The court ordered a new trial on both liability and damages because "the issues are so interrelated that damages cannot be separated from the facts underlying liability."

Hirst did not appeal from the new trial order, but the City appealed from the denial of its JNOV motion, contending Hirst had no standing to recover damages on her FEHA claim against the City. We determine the evidence supports that Hirst was a "person providing services pursuant to a contract" and therefore she was entitled to recover against the City for its employee's sexual harassment. (§ 12940, subd. (j)(1).) Based on

---

[1]     Statutory references are to the Government Code unless otherwise specified.

2

this conclusion, we do not reach the additional asserted ground for standing (whether Hirst was a "special employee" of the City). We affirm the court order denying the JNOV motion and remand for further proceedings under the court's new trial order.

FACTUAL AND PROCEDURAL BACKGROUND

Under the applicable review standard, we summarize the evidence in the light most favorable to Hirst. (See *Begnal v. Canfield & Assocs., Inc.* (2000) 78 Cal.App.4th 66, 72.) In the Discussion section, we describe additional evidence regarding the business and employment relationships among the City, AFN, and Hirst.

AFN provides phlebotomy services for law enforcement agencies that need blood samples drawn from suspects for intoxication testing and other purposes. In 2004, AFN entered into a contract with San Diego County (County), requiring AFN to supply personnel to perform blood draws "on an on-call basis" at locations throughout the County, including the Oceanside Police Department.

In August 2008, AFN hired Hirst, a certified and trained phlebotomist, to work on an on-call basis in the North County area. About one month later, while Hirst was performing these blood drawing services for the Oceanside Police Department, Oceanside police officer Garcia began making graphic sexual comments to her, and then repeated these comments during the next several months. These comments included Garcia telling Hirst " 'I'd like to bend you over and fuck you in the ass' " and " 'I want to watch you . . . give me a blow job' " and " 'you have a nice ass.' " Hirst did not immediately report these comments because—as a new employee—she was concerned about her job and was afraid of police officer retaliation.

3

In about May 2009, Hirst's AFN supervisor, Terry Johnston, questioned Hirst about Garcia, stating that Garcia has been "saying really nasty things about you" of a sexual nature. At that point, Hirst broke down and disclosed Officer Garcia's harassment. Johnston responded that he would need to report the conduct, but Hirst was "adamant" she did not want to report because she was afraid of retaliation. She "just wanted it to go away." Johnston continued discussing the issue with Hirst, insisting he would need to report the conduct. At one point, a contract reserve officer overheard these conversations, and volunteered to report the conduct to an Oceanside police sergeant.

Shortly after, the reserve officer reported the conduct. In response, Garcia's supervisor ordered him to stay away from Hirst, and began an investigation. Upon learning of the harassment, AFN's president and chief executive officer communicated with the Oceanside Police Department in an effort to ensure Garcia would be appropriately controlled and disciplined. The AFN president also counseled Hirst regarding safety measures.

During the next several months, Garcia engaged in several additional acts of harassment and/or retaliation against Hirst, including driving by and staring at her in a menacing way, kicking open a security gate in a dark area of the police station while letting Hirst into the station, making an intimidating comment about Hirst while she was at the station for a blood draw, and driving by her vehicle and mouthing the words " 'fuck you.' "

In September 2009, a City human resources manager prepared a report concluding that Officer Garcia had sexually harassed Hirst and setting forth numerous factual

4

findings supporting this conclusion. The report stated that Officer Garcia's sexual harassment of Hirst was "inexcusable in the workplace . . . . Hirst made it clear that she was offended by [his] statements and that Officer Garcia's continued conduct unreasonably interfered with her work environment and caused her to feel intimidated and offended." The manager concluded: "There is sufficient evidence to substantiate a finding that Officer [Garcia] engaged in sexually derogatory and suggestive statements and graphic verbal commentary and Hostile Work Environment Sexual Harassment under the standards established by the [City's internal harassment and discrimination prevention policy]. The substantiated evidence in this investigation also indicates a high likelihood that Officer Garcia's actions meet the elements necessary to establish a prima facie case of Hostile Work Environment Sexual Harassment under the California Fair Employment and Housing Act (FEHA)."

Based on this report, the Oceanside Police Department put Garcia on administrative leave. The police chief recommended termination, and this decision was affirmed by the city manager. Garcia's termination became final after he unsuccessfully challenged the termination at an arbitration hearing.

About one year later, Hirst sued the City.[2] She initially alleged seven causes of action, but only her FEHA sexual harassment claim remained by the time of trial. Hirst's theory was that Garcia sexually harassed her and that the City was liable either because

---

[2]     Hirst also sued Garcia, but dismissed him during trial.

5

Garcia was her supervisor or because the City knew or should have known about the harassment and failed to take immediate corrective action. (§ 12940, subd. (j).)

At trial, Hirst presented the evidence summarized above regarding the harassment, and also presented evidence regarding the City's failure to promptly prevent the continuing harassment and her emotional distress resulting from Garcia's conduct. She additionally presented an expert, a human resources consultant, who testified that once the City learned of the harassment, it failed to take reasonable and timely steps to prevent continued harassment and retaliation against Hirst. The expert also opined that Hirst had standing under the FEHA to bring the sexual harassment action against the City.

In defense, the City agreed that Garcia had committed most of the alleged improper conduct but argued it was not liable under the FEHA because (1) Hirst lacked standing to recover as she was not a City employee or a "person providing services pursuant to a contract"; (2) Garcia's conduct was not severe and pervasive; (3) Garcia was not Hirst's supervisor as would be necessary to make the City strictly liable; and (4) the City responded timely and appropriately once it learned of the allegations. The City's expert, an employment attorney, opined that the City fulfilled its FEHA obligations to address and prevent the harassment and Hirst had no standing under the FEHA because she was not an employee, special employee, or an independent contractor.

At the conclusion of the evidence and arguments, the court gave the jury a special verdict form containing numerous questions. The first question asked: "Was Kimberli Hirst an employee of the City of Oceanside, a special employee of the City of Oceanside, *or* a person providing services under a contract?" (Italics added.) The jury answered

6

"Yes" to this question.  The jury was also asked whether "Officer Gilbert Garcia, as Kimberli Hirst's supervisor, engage[d] in harassing conduct *or* did City of Oceanside know or should have known of the conduct and failed to take immediate and appropriate corrective action?"  (Italics added.)  The jury also answered "Yes" to this question.

In responding to the remaining questions on the verdict form, the jury found: Hirst was subjected to unwanted harassing conduct because she was a woman; the harassment was severe or pervasive; a reasonable woman would have considered the work environment to be hostile or abusive; Hirst considered the work environment to be hostile or abusive; and the harassing conduct was a substantial factor in causing harm to Hirst.  The jury found Hirst's "[p]ast loss" was $750,000 and her "[f]uture loss" was $750,000.  The jury found AFN was "at fault" for the harm, but this fault was not a substantial factor in causing Hirst's harm.  The jury attributed 25 percent fault to Officer Garcia for causing the harm.  The jury found Hirst was not at fault for the harm.

The court entered judgment against the City on this verdict for $1.125 million.  The City then moved for a new trial on grounds of excessive damages and moved for a JNOV on the grounds that "plaintiff has no standing under the [FEHA], and as a matter of law, no other reasonable conclusion is legally deducible from the evidence."

The court denied the JNOV motion, but granted the City's new trial motion, stating it was convinced after "hearing, reviewing and weighing all of the evidence" that the damages awarded were "clearly exorbitant."  The court found a majority of the claimed damages were not legally compensable because they were for " 'litigation stress' "; Hirst's testimony regarding her emotional distress was "not credible"; the only medical expert in

7

the case testified that Hirst did not need any medication or future treatment; and Hirst's counsel had improperly urged the jury to award damages that would send the City a message, even though punitive damages cannot be awarded against a public entity. The court found a new trial on liability and damages was necessary because the issues were intertwined.

The City appealed from the order denying its JNOV motion, but Hirst did not appeal from the new trial order.[3]

DISCUSSION

The City contends the court erred in denying its JNOV motion because Hirst had no standing to recover on her FEHA harassment claim. In resolving this contention we initially describe the standards governing JNOV motions and legal standing under the FEHA. We next summarize the evidence relevant to the standing issue. We then explain our conclusion that Hirst had standing to recover against the City for Garcia's harassment because she was a "person providing services pursuant to a contract" under section 12940, subdivision (j)(1).

I. *JNOV Review Standards*

On appeal from the denial of a JNOV motion, an appellate court must review the record de novo and make an independent determination whether there is any substantial evidence to support the jury's findings. (*Pacific Corporate Group Holdings, LLC v. Keck* (2014) 232 Cal.App.4th 294, 309; *Trujillo v. North County Transit Dist.* (1998) 63

---

3     An order denying a JNOV motion is appealable even if the trial court granted a new trial motion. (See *Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 323-324.)

Cal.App.4th 280, 284 (*Trujillo*).)  This review is limited to determining whether there is any substantial evidence to support the jury's verdict.  (*Begnal v. Canfield & Assocs., Inc., supra*, 78 Cal.App.4th at p. 72.)  The court must accept as true the evidence supporting the verdict, disregard conflicting evidence, and indulge every legitimate inference to support the verdict.  (*Ibid*.)  If sufficient evidence supports the verdict, a reviewing court must uphold the court's denial of the JNOV motion.  (*Ibid.*)  If the appellant raises purely legal questions, we conduct a de novo review.  (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138; *Trujillo, supra*, 63 Cal.App.4th at p. 284.)

The issue presented requires us to interpret section 12940, subdivision (j) and its subparts.  In so doing, " '[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose.  We first examine the statutory language, giving it a plain and commonsense meaning.  We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment.  If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.  If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.'  [Citation.] 'Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence,

9

and part of an act in pursuance of the legislative purpose.' [Citation.]" (*Sierra Club v. Superior Court* (2013) 57 Cal.4th 157, 165-166.)

## II. *Standing To Recover for Sexual Harassment Under FEHA*

The FEHA establishes a comprehensive scheme intended to protect and safeguard the right and opportunity of all persons to seek and hold employment free from prohibited discrimination and harassment. (§ 12920.) Although the FEHA generally protects only "employees" and "applicants," the provisions prohibiting harassment contained in section 12940, subdivision (j) are intentionally broader. At the relevant times, section 12940, subdivision (j) provided that an employer may be held liable for its employee's harassment of an "employee, an applicant, *or* a person providing services pursuant to a contract." (§ 12940, subd. (j)(1), italics added.)[4]

The courts have interpreted the term "employee" used in this code section to include a "special 'employee,' " which is a worker employed by one entity who is also considered an employee of a second entity if that borrowing entity exercises certain power of control over the employee. (*Bradley v. Department of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1612, 1626-1627; see *State ex rel. Dept. of California Highway Patrol v. Superior Court* (2015) 60 Cal.4th 1002, 1008, fn. 2, 1012-1015 (*Alvarado*); *Marsh v. Tilley Steel Co.* (1980) 26 Cal.3d 486, 492-493.) In determining this special employment status, the main factor is the second entity's right to

---

[4] In 2014, the Legislature added two additional categories of individuals protected from harassment: "an unpaid intern" and "volunteer." (Stats. 2014, ch. 302.) Unless otherwise stated, all references to section 12940, subdivision (j) are to the former statutory version applicable before the 2014 amendments became effective.

control job performance. (*Alvarado, supra*, 60 Cal.4th at p. 1012.) Other relevant factors include whether the individual was paid by and could be discharged by the second employer, was a skilled worker with substantial control over operational details, was engaged in the second employer's usual business, and used the second employer's tools and equipment. (*Id.* at p. 1014.) The administrative regulations define one type of employee that comes within this special employment status: individuals compensated by a temporary employment agency who are assigned to work for a contracted employer. (Cal. Code Regs., tit. 2, § 11008, subd. (b)(5); see *Mathieu v. Norrell Corp.* (2004) 115 Cal.App.4th 1174, 1182-1184.)

The second relevant category—"a person providing services pursuant to a contract"—is specifically defined in section 12940, subdivision (j)(5):

> "For purposes of this subdivision, 'a person providing services pursuant to a contract' means a person who meets all of the following criteria:
>
> (A) The person has the right to control the performance of the contract for services and discretion as to the manner of performance.
>
> (B) The person is customarily engaged in an independently established business.
>
> (C) The person has control over the time and place the work is performed, supplies the tools and instruments used in the work, and performs work that requires a particular skill not ordinarily used in the course of the employer's work."

A "person" is defined to include "one or more individuals, partnerships, associations, corporations, limited liability companies, legal representatives, trustees, trustees in bankruptcy, and receivers or other fiduciaries." (§ 12925, subd. (d).)

11

An employer may also be liable for the sexual harassment committed by "*nonemployees*" on "employees, applicants, or persons providing services pursuant to a contract in the workplace" if "the employer, or its agents or supervisors, knows or should have known of the conduct and fails to take immediate and appropriate corrective action." (§ 12940, subd. (j)(1), italics added.) However, "[i]n reviewing cases involving the acts of nonemployees, the extent of the employer's control and any other legal responsibility that the employer may have with respect to the conduct of those nonemployees shall be considered." (*Ibid.*)

### III. *Relevant Facts Regarding Hirst's Employment Status*

Under the contract between AFN and the County, AFN agreed to provide on-call employees to perform phlebotomy services at law enforcement and health care locations throughout the County. The contract required the employees to comply with state administrative regulations applicable to blood draws and be certified to perform the blood draws. The contract further required the phlebotomy services to be performed under the direct supervision of a sworn law enforcement officer or a crime lab forensic staff member. Under the contract, AFN's employees were required to provide all necessary materials to perform the blood draws.

The contract specifically stated that AFN is an "independent [c]ontractor," and "neither [AFN] nor [AFN's] employees . . . shall be deemed to be employees of the County." The contract required AFN to obtain all employees required to perform its obligations under the agreement, and stated the employees shall "be at [AFN's] sole cost and expense . . . ." The contract further stated that AFN "shall perform its obligations

12

according to [its] own means and methods of work . . . which shall not be subject to control or supervision by County except as to the results of the work." The contract also provided that neither AFN nor any of its employees "shall be entitled to any benefits to which County employees are entitled, including without limitation, overtime, retirement benefits, workers' compensation benefits and injury leave."

The evidence at trial showed the contract implementation was consistent with these provisions. AFN had approximately 80 on-call certified employees in the San Diego area. AFN trained its employees, and they were supervised by an AFN supervisor and manager. AFN had the authority to hire and fire the employees, and the County had no authority over these matters. Each month, an AFN supervisor prepared a schedule determining which AFN phlebotomist would be assigned to which shifts for which agencies. When a law enforcement officer needed a blood draw, the officer would contact his law enforcement agency's dispatch, which would contact AFN's dispatch, which would contact the AFN phlebotomist on call. The AFN phlebotomist would then travel to the site where the blood draw was needed. The phlebotomist would be paid by AFN according to the number of blood draws completed each month.

AFN phlebotomists were not permitted to enter secure law enforcement facilities without an escort. A law enforcement officer would meet the AFN phlebotomist at the security gate and take the phlebotomist to the room where the blood draws were performed. The officer would tell the AFN phlebotomist whether the test was still needed, and whether it was voluntary or forcible (i.e., whether the suspect was cooperative). The AFN phlebotomist then drew blood as he or she saw fit according to

13

the worker's applicable medical training, with the officer observing the procedure. At all times, the officer would provide supervision and maintain security of both the suspect and the phlebotomist.

Once the blood draw was complete, the AFN phlebotomist and the officer who witnessed the draw would sign a form confirming that the draw had occurred. This form was necessary for the phlebotomist and AFN to receive compensation for the work performed. The officer would then escort the AFN phlebotomist out of the facility. A typical AFN phlebotomist's site visit took about 15 minutes from start to finish.

In her testimony, Hirst confirmed these procedures applied to her work at the Oceanside police station. Hirst brought the equipment and relied on her own expertise when performing blood draws. But a law enforcement officer was always present when she was drawing blood. She was escorted into the station by a police officer, who would unlock an outside gate to allow her to enter the facilities. The officer had complete responsibility over the suspect and the environment under which the blood draw was administered, and Hirst had authority over the blood draw once the suspect was in a position that allowed a safe blood draw. The procedure would take about five to 30 minutes depending on the cooperation of the suspect.

IV. *Analysis*

At trial, Hirst contended she was entitled to recover against the City for unlawful sexual harassment because she was either a "special employee" or a "person providing services pursuant to a contract" under section 12940, subdivision (j)(1). Although both parties presented expert evidence on these issues, our legal analysis is primarily a matter

14

of statutory interpretation.  The jury answered "Yes" to the special verdict question whether Hirst was "an employee of the City of Oceanside, a special employee of the City of Oceanside, *or* a person providing services under a contract."  (Italics added.)  Thus, for purposes of reviewing the court's denial of the JNOV motion on the standing issue, we must uphold the court's order if the evidence supported any one of these statutory categories.

As explained below, we conclude Hirst fell within the "person providing services pursuant to a contract" category, and therefore need not reach the special employee question.  (§ 12940, subd. (j).)  The record shows Hirst was providing services to the City "pursuant to a contract" during the time she was sexually harassed by a City employee.  AFN and the County entered into a contract requiring AFN to provide employees for on-call phlebotomist services to law enforcement agencies throughout the County.  AFN hired Hirst to fulfill the obligations of this contract, and Hirst's blood drawing services for the Oceanside Police Department were specifically performed pursuant to the terms of the contract.  The jury found Garcia sexually harassed Hirst when she was performing these contractual services.

The City argues Hirst did not satisfy the "providing services pursuant to a contract" category because this phrase has been specifically defined in the statutes, and she does not fit each of the elements of this definition.  As stated above, section 12940, subdivision (j)(5) defines "a person providing services pursuant to a contract" as one who (1) "has the right to control the performance of the contract for services and discretion as to the manner of performance"; (2) "is customarily engaged in an independently

15

established business"; and (3) "has control over the time and place the work is performed, supplies the tools and instruments used in the work, and performs work that requires a particular skill not ordinarily used in the course of the employer's work." (§ 12940, subd. (j)(5)(A)-(C).)

The facts showed Hirst satisfied this statutory definition. When she was dispatched to the Oceanside Police Department, Hirst exercised her own professional judgment in implementing the blood drawing services. Although the police department closely monitored this work, this was purely a function of its law enforcement obligation to control the suspect, ensure Hirst's safety, and preserve the validity of the blood evidence. (See *Alvarado, supra*, 60 Cal.4th at pp. 1012-1013.) There is no evidence the Oceanside Police Department had employment authority over Hirst, other than to secure the environment in which this work was performed. This type of supervision does not create an employment relationship or negate a worker's independent contractor status. (See *ibid*.) Further, Hirst was customarily engaged in the phlebotomist business, and this business was not a usual part of the City's public duties. Hirst also brought equipment to perform these services and did not use the City's property or rely on its expertise, and the evidence showed the blood drawing work was not a skill ordinarily possessed by the City's law enforcement personnel.

At trial, the focus of Hirst's argument was not that she was personally described by these provisions; she instead argued she was entitled to trigger FEHA protection because AFN came within the statutory definition. The City does not dispute that AFN was a "person providing services pursuant to a contract" under the section 12940, subdivision

16

(j)(5) definition. But the City argues AFN's status cannot be attributed to Hirst because she is not the "person" who contracted for the work and instead was merely the employee of the independent contractor.

This view is unsupported. AFN is a corporation that must act through its agents. (See *Black v. Bank of America* (1994) 30 Cal.App.4th 1, 6.) As a business entity, AFN does not personally provide the phlebotomist contractor services; its services are performed by individuals (including Hirst) acting on AFN's behalf. It would be unreasonable to conclude the Legislature would have intended that AFN had standing but those who actually performed the services "pursuant to a contract" were barred from recovery.

The specific language of the statute supports this conclusion. Section 12940, subdivision (j)(1) provides an employer may be liable when an employee harasses a "person providing services pursuant to *a* contract." (Italics added.) This provision does not require the protected person to be *the* contracting party. Likewise, subdivision (j)(5)(B) provides that the person must be "customarily *engaged* in an independently established business." (Italics added.) This provision does not state that the person must own or operate the "independently established business." Engaged means to be "involved in [the] activity," not run the operation. (See Merriam-Webster's Collegiate Dict. (10th ed. 2002) p. 383.)

The City contends that if the Legislature had intended an employer would be liable to "each service provider's employees," it would have defined the expanded category "to include independent contractors *and their employees*." But the Legislature did not define

17

this category as "independent contractors."  Rather, it used the phrase "person providing services pursuant to a contract," and defined this phrase to include persons functioning as an independent contractor at the employer's business.  (§ 12940, subd. (j)(1), (5).)  This description supports that an employee of an independent contractor has standing to bring an action for sexual harassment under the FEHA.

Our determination is also supported by the statute's legislative history.  Before 2000, only an "applicant" or "employee" had standing to bring a harassment claim under the FEHA.  In 1999, the Legislature amended section 12940, subdivision (j) to include "person[s] providing services pursuant to a contract."  (See Stats. 1999, ch. 591, § 8.)  The express purpose was to "*expand[ ]* the reach of the state's harassment (but not discrimination) protections by including contract workers within FEHA's coverage."  (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1670 (1999-2000 Reg. Sess.) as amended May 6, 1999, p. 8, italics added.)  A legislative committee analysis noted that prior regulatory definitions and judicial decisions had excluded independent contractors from harassment-protection coverage, and the new language would "extend FEHA's harassment protections to independent contractors."  (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1670 (1999-2000 Reg. Sess.) as amended May 6, 1999, p. 8.)  The committee analysis explained:  "[T]here already is important precedent in California law for protecting independent contractors from harassment," citing Civil Code section 51.9, and "consistent" with this code section, the bill would "add individuals in California who are 'under the control of a principal regarding only the result of [their] work, and not regarding the means by which [their work] is accomplished.'  This change

18

is intended to provide needed protections for the ever-growing numbers of workers who are hired as independent contractors rather than employees, and who currently work unprotected against harassment simply by virtue of the contractual nature of their work and their lesser cost to the businesses who hire them."  (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1670, *supra*, p. 9.)

Another legislative bill analysis stated:

> "The bill's supporters acknowledge that sexual harassment laws were originally premised on the idea that a woman could not get away from a harasser's advances without losing her job, or suffering some other adverse employment action.  Independent contractors were excluded from the employment protection statutes, as it was considered that they could get away, not being bound as an employee to the bad situation.  However, the dynamics of employment have changed in recent years, they say. Today employers have substantially increased the use of contract workers as a cost savings measure. . . .  Situations where a contract employee could be subjected to harassment without recourse include a self-employed specialist such as a graphic designer, who works 'in-house' on a company's newsletter; or a long-term 'independent contractor,' who performs as a traditional employee, but is never made a true employee—thereby saving the employer from paying taxes and benefits."  (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1670 (1999-2000 Reg. Sess.) as amended June 1, 1999, pp. 6-7.)

These descriptions of the bill's purpose support a conclusion that Hirst had standing to recover against the City under the facts presented at trial.  Hirst was a skilled worker whose work was in the nature of an independent contractor, i.e., the City did not control the means by which the work was accomplished (other than to provide law enforcement supervision), and the City was concerned primarily with the results of the work.  In performing the phlebotomist services, Hirst was required to work in the presence of City employees, and was frequently required to be in a locked booking room

19

with a City police officer to perform the phlebotomist services. The fact that a worker in Hirst's position previously could not recover for a City employee harassment whereas a City employee working alongside her could do so was a motivating reason for the Legislature's decision to expand harassment protections to nonemployee contract workers.

The City argues the examples set forth in the bill analysis (individual contractors who own their own businesses) reflect that the Legislature was concerned solely about individuals who had no other remedy for employee sexual harassment. The City maintains that this concern "does not apply to Hirst" because "[s]he had a traditional employer," and thus had recourse for sexual harassment by bringing an action against AFN. The City relies on the portion of section 12940, subdivision (j)(1) that provides an employer may be held liable for a *nonemployee's* harassing acts if the employer had the requisite knowledge and failed to take appropriate corrective action. Under this provision, the City argues Hirst had a potential action against her "traditional" employer (AFN) for Officer Garcia's harassment, and therefore the Legislature did not intend someone in her position to be a covered party under the FEHA.

This argument is unpersuasive. The Legislature specifically provided that recovery against an employer for a *nonemployee's* acts depends on "the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of those nonemployees . . . ." (§ 12940, subd. (j)(1).) This means the potential scope of an employer's liability over *nonemployee* harassment is more limited than an employer's liability for its own employees' conduct. For example, in the

20

situation here where the evidence showed the contract worker's employer (AFN) had little or no bargaining power over a public entity such as the Oceanside Police Department and little or no process for influencing or addressing the behavior of the offending police officer, this alternative avenue for redress was not a substitute for obtaining meaningful relief. As the harasser's employer, the City had more effective and immediate means to prevent and/or correct the harassment. There is nothing in the statutory language or the legislative history suggesting the Legislature intended that a contract worker is precluded from recovery as a matter of law because he or she has an alternative (but less direct and potentially less effective) means for redress. The courts have long recognized that a dual employer relationship may exist and that the existence of a second employer does not necessarily preclude statutory protection from both employers. (*Marsh, supra*, 26 Cal.3d at pp. 492-493; see *Kowalski v. Shell Oil Co.* (1979) 23 Cal.3d 168, 174; *Mathieu v. Norrell Corp., supra*, 115 Cal.App.4th at pp. 1182-1184.) We necessarily presume the Legislature enacted the contract worker amendment with this principle in mind. (See *Busse v. United PanAm Financial Corp.* (2014) 222 Cal.App.4th 1028, 1038.)

We are also unpersuaded by the City's arguments that upholding the jury's finding that Hirst is a "person providing services pursuant to a contract" under section 12940, subdivisions (j)(1) and (j)(5) will lead to an unwarranted expansion of FEHA. This contract worker category applies only to harassment claims by a worker performing work *pursuant to a contract* with the harasser's employer, *and* requires that the plaintiff prove the perpetrator was a supervisor or agent or that the perpetrator's employer knew or

21

should have known of the harassment and failed to take immediate and appropriate corrective action. (§ 12940, subd. (j)(1).) The conclusion that Hirst has standing under these provisions does not impose any additional duties on the employer as employers have an affirmative duty to take all reasonable steps necessary to prevent their employees from engaging in prohibited harassment, and to provide the necessary training and guidance to their employees. (See §§ 12940, subd. (k), 12950.) As recognized by the City's human resource manager in this case, these standards and affirmative duties necessarily extend to employee conduct towards employees *and* other contract workers. Protecting those who work alongside employees from harassment implements the statutory goals of affording equal opportunity and eliminating discrimination and harassment in the workplace. (See § 12920.) Under the statutory language, there is no reasoned basis to distinguish between a contract worker who owns his or her own business and a contract worker who is employed by an independent business to perform the same type of work. Because both individuals are potentially subject to the same harassing conduct, it is only reasonable to conclude the Legislature intended they have equivalent remedies.

We also find unavailing the City's claim that a holding that individuals performing work pursuant to a contract—such as Hirst—are protected under FEHA harassment provisions will lead to frivolous lawsuits. A similar argument was made by the bill's opponents in 1999, and rejected by the Legislature when it enacted the amendment at issue here. (See Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1670 (1999-2000 Reg. Sess.) as amended June 1, 1999.)

22

The City cites prior decisions holding that volunteers have no standing to bring FEHA claims to support its argument that for cost reasons the Legislature would not have intended to protect employees of independent contractors. (See *Munoz v. City of Palmdale* (1999) 75 Cal.App.4th 367, 372.) However, in 2014, the Legislature amended section 12940, subdivision (j) to include an "unpaid intern" and "volunteer" within the scope of FEHA protection. (Stats. 2014, ch. 302, § 1.) In so doing, the Legislature cited its inclusion of independent contractors in 1999 as an example of the need to protect all categories of workers, stating that "there is an argument that, like an independent contractor, an unpaid intern may be subject to the same harassing conditions as traditional employees and is therefore in need of protection under the law." (Assem. Com. on Labor and Employment, Analysis of Assem. Bill No. 1443 (2013-2014 Reg. Sess.) as introduced Jan. 6, 2014.)

Our conclusion that Hirst had legal standing to bring an action against the City comports with the well-settled rule that courts must broadly construe FEHA provisions to implement the legislative intent to provide protections to workers and end the practice of sexual (and other forms of) harassment in the workplace, and to hold those with the ability and authority to prevent and remedy the situation responsible for addressing the problem. (See §§ 12920, 12921, 12993, subd. (a); *Fitzsimons v. California Emergency Physicians Medical Group* (2012) 205 Cal.App.4th 1423, 1429-1430.) The Legislature specifically provided that an employer is liable for sexual harassment committed by an employee against an employee or "a person providing services pursuant to a contract." (§ 12940, subd. (j)(1).) Hirst was an individual performing services pursuant to a

23

contract.  There is no basis in this statutory phrase or the definition of the phrase to preclude recovery for an individual who provided services under a contract merely because he or she is also employed by a separate entity with respect to the work performed.

## DISPOSITION

Order affirmed.  Appellant to bear respondent's costs on appeal.


HALLER, J.

WE CONCUR:


BENKE, Acting P. J.


HUFFMAN, J.

24