Filed 6/12/15; pub. order 7/10/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

JAMES McKENZIE,

    Plaintiff and Appellant,

      v.

FORD MOTOR COMPANY et al.,

    Defendants and Respondents.

G049772

(Super. Ct. No. 30-2012-00573060)

O P I N I O N

          Appeal from an order of the Superior Court of Orange County, David T. McEachen, Judge.  Reversed and remanded.

          Anderson Law Firm and Martin W. Anderson for Plaintiff and Appellant.

          Sanders Roberts & Jewett, Reginald Roberts, Jr.; Snell & Wilmer, Mary-Christine Sungaila and Jenny Hua for Defendants and Respondents.

          *              *              *

James McKenzie appeals from the trial court's order awarding him only $28,350 of the nearly $48,000 in attorney fees he sought in this case, following the parties' settlement of McKenzie's claim under the automobile "lemon law" provisions of the Song-Beverly Consumer Warranty Act (Civ. Code, § 1790 et seq.). He contends the court abused its discretion by awarding him none of the attorney fees he incurred following Ford's initial offer to compromise in April 2013, even though the case did not settle until months later.

The trial court refused to award McKenzie any of the attorney fees incurred in the wake of Ford's initial offer because it viewed the compromise offer ultimately accepted by McKenzie as essentially identical to the offer he had initially rejected – distinguished only by his "demand that [he] be allowed to file [a fee] motion." The court concluded the entire 42 hours billed by McKenzie's counsel in the wake of Ford's initial offer amounted to "plaintiff's counsel exaggerating the amount of their fees to increase their prized fees." In short, the court concluded McKenzie unreasonably delayed settlement for the sole purpose of ginning up his fee award. As further support for that determination, the court also found that after receipt of Ford's initial offer, McKenzie's two attorneys billed for "many" hours of duplicative work, which the court deemed unreasonable.

We reverse. The trial court's comparative assessment of Ford's two settlement offers was erroneous as a matter of law. Even Ford concedes its initial settlement offer incorporated numerous extraneous provisions – including broad releases of both Ford and nonparties, an illegal confidentiality clause characterized as "material" to the settlement, and what amounted to an opt-out provision in Ford's favor – all of which were excised from the offer McKenzie later accepted. These differences are significant, and thus McKenzie's rejection of the initial offer was reasonable, requiring his counsel to continue working on the case. Moreover, contrary to the court's belief, both of Ford's compromise offers had *the same* attorney fee provision, allowing

2

McKenzie the option of either accepting $15,000 in full payment of his reasonable fees and costs, or filing a motion to obtain an award of fees in a higher amount. Given that McKenzie had already incurred over $28,000 in fees and costs by the time of Ford's initial offer – almost twice what Ford was offering to pay without a motion – it was not unreasonable for him to opt for pursuing that fee motion. And the fees reasonably incurred in pursuing the fee motion were properly includable in McKenzie's attorney fees award.

The trial court's erroneous comparison of Ford's initial compromise offer with the offer McKenzie later accepted fatally undermines its conclusion that the entire amount of hours billed by McKenzie's counsel in the wake of that initial offer was unjustified. The court's additional finding, that McKenzie's two attorneys also engaged in instances of duplicative billing after Ford's initial offer, does not support a complete denial of fees for that period. Consequently, we remand the matter to the trial court with directions to reconsider the fee award.

## FACTS

McKenzie filed his complaint in May 2012, alleging causes of action arising out of his purchase of a defective Ford Fiesta automobile in July 2011. McKenzie's complaint prayed for damages and restitution of approximately $23,000, civil penalties equal to two times his damages for each violation of his warranty, an order enjoining Ford from engaging in any act or practice constituting a violation of Business and Professions Code section 17531, and an award of attorney fees and costs. McKenzie was represented in the lawsuit by two separate attorneys, Martin W. Anderson of the Anderson Law Firm, and Jeffrey Kane of the Law Office of Jeffrey Kane.

3

Ford filed its answer in July 2012, and it subsequently responded to McKenzie's written discovery, which was completed in August 2012. In November 2012, a jury trial was scheduled for June 2013.

In January 2013, Ford substituted new counsel into the case, and on April 24, 2013, Ford moved ex parte for an order continuing the trial so that it would have additional time to conduct its own discovery. McKenzie opposed the motion on the basis Ford had the opportunity to conduct discovery, but failed to do so in a timely manner. McKenzie claimed that having completed his own discovery, he was ready to proceed to trial as scheduled. The trial date was continued for two months, to September 2013.

The day after trial was continued, Ford served an offer to compromise McKenzie's claim, pursuant to Code of Civil Procedure section 998 (section 998). The financial provisions of the offer were that Ford would repurchase McKenzie's automobile for the sum of $25,000 and would either pay McKenzie $15,000 in attorney fees, or agree that McKenzie could move the court for an award of reasonable attorney fees in some other amount. However, Ford's offer was explicitly based on the following factual premises: that "[e]very concern presented by [McKenzie to Ford] was repaired within a reasonable number of repair attempts. The vehicle did not meet the statutory presumption for reasonable number of repair attempts. The vehicle did not meet the statutory presumption for reasonable number of repair attempts when [McKenzie] called Ford requesting a repurchase. Much of [McKenzie's] attorneys' fees were incurred unreasonably and unnecessarily [and] Ford contends that [McKenzie] has no viable claims against it in this action."

Moreover, the offer expressly required McKenzie to "execute a release of all claims and causes of action arising out of any breach of implied warranty or breach of express warranty for the subject vehicle." However, because no specific release was appended to the offer, McKenzie's counsel asked Ford's counsel for a copy of Ford's

4

proposed release to review before deciding whether to accept the offer. After several more requests, Ford provided the proposed release approximately two weeks later.

The release provided by Ford amounted to a full-blown settlement agreement containing in excess of six single-spaced pages. Among other things, it included provisions requiring that McKenzie waive any and all claims in "as broad [a manner] as can possibly be created." By its terms, this release included claims both known and unknown – and even those claims "not yet accrued" or which McKenzie "may ever obtain" in the future – against not only Ford, but also against any dealerships involved in selling or servicing the automobile. The agreement also required McKenzie to effectively warrant the condition of the vehicle at the time it was surrendered to Ford, and to have the vehicle repaired at his own expense if deemed not "in acceptable condition." And it allowed Ford to declare the agreement "null and void" if it rejected the vehicle's condition. Finally, the agreement required McKenzie to refrain from disclosing the content of the settlement to anyone, including "newspapers, members of the press or legal reporting services, consumer organizations, owner or prospective owners of vehicles distributed by Ford Motor Company, experts, consultants, attorney, government agencies, governmental entities or elected representatives." This confidentiality provision was expressly characterized as a "material part of this Agreement." Such confidentiality provisions are explicitly prohibited by Civil Code section 1793.26, subdivision (a)(2).

McKenzie countered Ford's proposed settlement with his own formal section 998 offer: to allow judgment to be entered in his favor for $25,000.01 (one penny more than Ford had offered), plus reasonable attorney fees and court costs to be determined by the court, in exchange for which McKenzie would return the automobile to Ford with clear title. Following that offer, McKenzie's counsel emphasized to Ford's counsel that McKenzie was anxious to put the matter to rest, and was willing to settle the

5

matter on essentially the same financial terms Ford had proposed, but without the added release language. Ford allowed McKenzie's offer to lapse without response.

Approximately two months later, Ford proposed a new section 998 compromise which was essentially identical to McKenzie's lapsed offer (although it knocked the payment back down to $25,000 – deleting McKenzie's one cent increase). Ford's proposal was devoid of any reference to the provisions of its earlier six-page release document and required only that McKenzie return his defective automobile with clear title in exchange for the money. Ford's new offer once again proposed to pay McKenzie $15,000 in attorney fees and costs, but again preserved his right to instead file a motion for an award of reasonable fees and costs in a different amount. McKenzie accepted that offer promptly, and judgment was thereafter entered thereon in September 2013.

McKenzie filed a cost memorandum seeking routine litigation costs, plus fees to be decided by motion. And in November 2013, he filed a motion seeking an order awarding him $47,491.25 in attorney fees and other costs totaling $808.83. The motion was supported by declarations, billing records, and prior court orders documenting large attorney fee awards to counsel in similar cases.

The 42 hours billed by McKenzie's attorneys in the period following Ford's initial offer included time spent reviewing and communicating with Ford's counsel about the initial offer and its perceived deficiencies, preparing McKenzie's counter offer, and processing the details of the settlement when it was reached. Among other things, attorney Kane billed 2.5 hours to attend the "vehicle surrender" called for in the settlement agreement. And attorney Anderson billed .4 hours for preparing the memorandum of costs, 3.5 hours for preparing the motion for fees, and estimated an additional 4 hours to draft and file a reply brief, plus 2.5 hours to appear at the hearing. Kane also estimated he would spend 4 hours to "review opposition, prepare reply and supporting declarations, and appear at hearing on motion for fees and costs."

6

Ford opposed the fee motion, claiming the amount sought by McKenzie was unreasonable for a "standard 'lemon law' case." Ford focused on the time period after it made the initial section 998 offer to compromise, arguing that "[a]fter learning of Ford's willingness to buy back the vehicle [in April 2013], Plaintiff's two attorneys ran up approximately 42 additional billable hours before agreeing to a buy back of the vehicle with a fee motion for this Court to decide reasonable attorney's fees." Ford pointed out that by contrast, its own attorneys had billed only a combined 21.2 hours from January 2013 (when they substituted into the case) through the completion of settlement – albeit without including the time spent opposing McKenzie's fee motion.

Specifically, Ford claimed that after its initial offer to repurchase McKenzie's vehicle, his attorneys had a heightened incentive to inflate their fees, "knowing their likelihood of recovering fees given the repurchase offer were extremely high."

Ford also asserted that the billing reports provided by McKenzie's counsel demonstrated they had unreasonably staffed the case with "two lead attorneys, and both attorneys billed for work that could have been performed by one." It pointed out instances in the billing statements where it appeared McKenzie's two lead counsel (with billing rates of $475 per hour each) had billed time for the same basic task – such as reviewing an email from Ford's counsel, or reviewing an amended vehicle inspection notice – in the wake of Ford's initial settlement offer. These instances added up to two hours of duplicated time. In light of this duplicative effort between the attorneys, Ford requested the court award McKenzie's counsel compensation for only half of the number of hours claimed for the period following Ford's initial offer – cutting the compensable time from 42 hours to 21 hours.

In a reply brief, McKenzie contended the initial compromise offer made by Ford was legally invalid as a section 998 offer because it required him to release claims and parties not involved in his lawsuit, and incorporated an illegal confidentiality

7

provision.  It was also unacceptable because it would have obligated McKenzie to pay for repairs to the vehicle as demanded by Ford, and gave Ford the right to rescind if he did not.  Additionally, McKenzie's counsel defended staffing the case with two lead attorneys, explaining that each had a different expertise – "Mr. Anderson specializes in legal research and writing, while Mr. Kane has expertise in automobiles and automotive repair."  They did not dispute there was some duplication of effort, but asserted the amount was small, and argued it had been more than offset by the efficiency inherent in allowing each attorney to focus on his distinct area of expertise.

The court granted McKenzie's fee request, but reduced the amount of fees from the $48,300 requested to $28,350. 08 – the exact amount it determined McKenzie had incurred *before* service of Ford's initial offer to compromise, which was served one year after the case was filed:  "Until 4/25/13, plaintiff's counsel billed only $28,350.08.  Then, after [Ford's offer to compromise] was sent plaintiff's counsel racked up another $19,950 between 4/25/13 and 11/7/13."

The court made clear it believed the settlement offer accepted by McKenzie was indistinguishable from the initial offer made by Ford in April 2013 – other than that it would allow him to file a motion for attorney fees:  "Defendant, after a year of litigation offered to buy the car back for [$25,000,] more than what plaintiff paid and reasonable fees of  $15,000."  "Plaintiff initially rejected this offer but eventually accepted the offer with the stipulation that plaintiff be allowed to submit this motion for attorneys fees."  Moreover, "[a]fter rejecting the offer in April 2013, plaintiff's counsel then billed another 42 hours before accepting the offer with the demand that plaintiff be allowed to file this motion.  [¶] This conduct amounts to unnecessary overbilling."  The court concluded that "the 42 hours billed after the [initial offer to compromise] was served in April 2013, appear to be plaintiff's counsel exaggerating the amount of their fees to increase their prized fees."

And as further support for its ruling, the court noted that "many of the 42 hours that were billed after the [initial offer to compromise] was double billing by both Mr. Anderson and Mr. Kane for many of the same tasks, such as both of them reviewing the same email from defendant's counsel or both reviewing drafts of documents coming from their office, or both of them billing for preparing the same email. None of this work should have been done by both partners [and] it is unreasonable to charge a client – or opposing party for duplication of tasks."

DISCUSSION

*1. Background Law and Standard of Review*

Civil Code section 1794, subdivision (a) states: "Any buyer of consumer goods who is damaged by a failure to comply with any obligation under this chapter or under an implied or express warranty or service contract may bring an action for the recovery of damages and other legal and equitable relief." And subdivision (d) of that statute provides: "If the buyer prevails in an action under this section, the buyer shall be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of costs and expenses, including attorney's fees based on actual time expended, determined by the court to have been reasonably incurred by the buyer in connection with the commencement and prosecution of such action."

"The plain wording of the statute requires the trial court to base the fee award upon actual time expended on the case, as long as such fees are *reasonably* incurred—both from the standpoint of time spent and the amount charged. . . . 'It requires the trial court to make an initial determination of the actual time expended; and then to ascertain whether under all the circumstances of the case the amount of actual time expended and the monetary charge being made for the time expended are reasonable. These circumstances may include, but are not limited to, factors such as the

9

complexity of the case and procedural demands, the skill exhibited and the results achieved.  If the time expended or the monetary charge being made for the time expended are not reasonable under all the circumstances, then the court must take this into account and award attorney fees in a lesser amount.'  [The] prevailing party has the burden of showing that the fees incurred were reasonably necessary to the conduct of the litigation, and were reasonable in amount."  (*Robertson v. Fleetwood Travel Trailers of California, Inc.* (2006) 144 Cal.App.4th 785, 817-818.)

The fees incurred in preparing a motion for fees are properly includable in the award.  (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1133 ["an attorney fee award should ordinarily include compensation for *all* the hours *reasonably spent*, including those relating solely to the fee"].)

We apply an abuse of discretion standard when reviewing a trial court order awarding attorney fees.  (*City of Colton v. Singletary* (2012) 206 Cal.App.4th 751, 784) "'Trial judges are entrusted with this discretionary determination because they are in the best position to assess the value of the professional services rendered in their courts.'" (*Ellis v. Toshiba America Information Systems, Inc.* (2013) 218 Cal.App.4th 853, 882.) Hence, the fee award '"will not be disturbed unless the appellate court is convinced that it is clearly wrong."'  (*Serrano v. Priest* (1977) 20 Cal.3d 25, 49.)  Indulging all inferences in favor of the trial court's order, as we are required to do, we presume the trial court's attorney fees award is correct, and "[w]hen the trial court substantially reduces a fee or cost request, we infer the court has determined the request was inflated."  (*Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1323.)

*2.  The Award in This Case*

On appeal, McKenzie argues the court abused its discretion when it excluded from its award the entirety of fees McKenzie incurred after Ford's initial offer to compromise.  He points out that contrary to the trial court's apparent belief, Ford's

10

initial offer was not effectively the same as the offer he later accepted, and claims he acted reasonably in rejecting it because it required him to acknowledge that his claims against Ford lacked merit, to enter into overly broad releases in favor of both Ford and third parties, to repay for repair of his vehicle in accordance with Ford's demands upon surrender, and to adhere to an illegal confidentiality provision. And because his rejection of Ford's initial offer was reasonable, McKenzie claims his continued accrual of attorney fees in the wake of that offer was also reasonable, and thus compensable, as a matter of law.

Ford counters by first emphasizing our obligation to indulge all inferences in favor of the trial court's ruling, and pointing out the trial court is not required to explain in detail the basis of its fee decision. Ford urges us to construe the court's reduction of McKenzie's fee as reflecting an assessment of the usual lodestar factors considered in determining fee amounts – e.g., the complexity of the case, the expertise of McKenzie's counsel, and the early stage at which the case was settled – and a resulting determination that $28,350.08 was simply an overall "reasonable" fee for the work performed.

However, while we could certainly do that in the absence of any specific analysis provided by the trial court, we cannot ignore the court's reasoning when detailed in the order. In this case, the court was quite explicit in explaining the basis for reducing McKenzie's fees – rather than imposing a general reduction on the fees requested from the outset, on the basis the rates charged by McKenzie's counsel were too high or the overall time claimed was unreasonable given the complexity of the case, the court characterized its reduction as "based on redaction of fees for duplicated and unnecessary services and billing *performed after defendant's service of its CCP Section 998 offer*." (Italics added.) The court awarded McKenzie 100 percent of the fees he requested for the period before Ford's initial offer, but found the entirety of "the subsequent billing was unreasonable" and excised *that specific portion of the fees* from McKenzie's award.

11

When the court states its reasons explicitly, we cannot infer its exercise of discretion rested on a wholly different basis.

And when we examine the court's actual reasoning, we conclude its decision to deny McKenzie any fees for the period following Ford's initial compromise offer was an abuse of discretion. The court's decision was grounded on its view that the settlement offer ultimately accepted by McKenzie was essentially identical to the offer he had initially rejected – distinguished only by his "demand that [he] be allowed to file a [fee] motion." Thus, the court believed McKenzie acted unreasonably in rejecting that first offer, and that he did so for the purpose of "exaggerating . . . fees." Ford contends that decision was proper, citing *Meister v. Regents of the University of California* (1998) 67 Cal.App.4th 437, a case it describes as holding "the trial court could consider the fact that a party continued to litigate the matter after a reasonable, informal settlement offer had been made" as a basis for "'cut[ting] off attorney's fees' as of the date of the settlement offer."

But as McKenzie points out, Ford's initial section 998 offer was quite different than the one he ultimately accepted, containing several provisions which rendered it effectively unacceptable – all of which were excised from Ford's second offer.

Even Ford concedes its initial settlement offer incorporated numerous extraneous provisions. As Ford describes it, "the [initial] offer stated that Ford admitted no liability, McKenzie had no viable claims, and his attorneys had incurred unreasonable and unnecessary fees. . . . The proposed release, which Ford sent to McKenzie on May 9, had its own set of provisions, including provisions that waived McKenzie's claims under Civil Code [section] 1542 . . . and required confidentiality." Moreover, Ford acknowledges that although its second offer "contained the same financial terms as Ford's first offer," it "*eliminated the non-financial terms*." (Italics added.)

12

Ford suggests, however, that these extraneous provisions were of no particular significance because they were either legally meaningless or unenforceable, and thus McKenzie's refusal to accept the first offer incorporating them was unreasonable. For example, while Ford acknowledges that the confidentiality provision incorporated into its first offer was *expressly* prohibited by statute (see Civ. Code, § 1793.26, subd. (a)(2)), it claims that very illegality meant McKenzie should have just ignored the clause. The argument is disingenuous, at best.

What Ford does not acknowledge is that it expressly designated this prohibited confidentiality clause as a "material" provision of its proposed settlement. Whether the illegality of such a provision would result in its severance from the rest of the agreement, or would instead render the entire agreement invalid, is unclear. (See *Keene v. Harling* (1964) 61 Cal.2d 318, 320-321 ["'Whether a contract is entire or separable depends upon its language and subject matter, and this question is one of construction to be determined by the court according to the intention of the parties. If the contract is divisible, the first part may stand, although the latter is illegal'"].) Thus, at a minimum, by inserting this "material" confidentiality provision into its proposed settlement, Ford instilled uncertainty about the consequences of disregarding its terms. And such uncertainty would clearly favor Ford's interests, as it would naturally *inhibit* a plaintiff such as McKenzie from disclosing the terms of his settlement, as he might otherwise be inclined to. Only a plaintiff who was willing to adhere to the provisions of the "material" confidentiality clause would feel entirely comfortable entering into as settlement agreement which incorporates it. McKenzie's insistence that the illegal clause be removed was reasonable as a matter of law.

Moreover, Ford does not even address the significance of the other nonfinancial provisions incorporated into its initial offer, including its requirement that McKenzie execute a breathtakingly broad release. This proposed release required McKenzie to release not only the specific claims asserted against Ford in this case, but

13

also all other "known and unknown" claims, claims that have "not yet accrued" and any claims he "may ever obtain" that relate in any way to the "[s]ubject [v]ehicle." Arguably, this language – which was characterized as being "as broad as can possibly be created" – would anticipatorily release Ford from any damage claims arising out of injures McKenzie later sustained if the brakes on his vehicle had failed while he was enroute to surrender it in accordance with the settlement terms. Not only that, but the release would also have extended to the "selling and servicing dealerships" who were not even parties to the case, from any such claims. As McKenzie points out, a section 998 offer requiring the release of claims and parties not involved in the litigation is invalid as a means of shifting litigation expenses because "it would be hard enough for a trial court to place a value on a condition requiring the plaintiff to dismiss a single specific lawsuit she had already filed against the defendant in another court. But when the condition mandates surrender of an array of potential lawsuits against not only the defendant but two other parties the task becomes impossible." (*Valentino V. Elliott Sav-On Gas, Inc.* (1988) 201 Cal.App.3d 692, 700.) By the same token, it would be impossible for the trial court in this case to place a value on the unidentified claims McKenzie might have pursued against the nonparty dealerships that happen to have sold and serviced his defective vehicle. Thus, the court could not presume McKenzie acted unreasonably by refusing to accept a settlement from Ford which obligated him to release those claims as well.

All of the extraneous nonfinancial terms incorporated into Ford's initial section 998 offer were excised from Ford's second section 998 offer. That latter offer obligated McKenzie to do nothing more than dismiss the lawsuit and surrender his vehicle to Ford, in exchange for its payment of $25,000. McKenzie promptly accepted that offer – which differed by *only one cent* from the similarly stripped-down offer he had served on Ford two months earlier, and which Ford had allowed to lapse without response. Under these circumstances it is difficult to fault McKenzie for any delay in reaching a settlement.

14

Further, contrary to the court's belief, there was no difference between the attorney fee provisions contained in Ford's two offers. Even Ford agrees its two offers had identical attorney fee provisions: "As with the first offer, [it] allowed McKenzie to elect to receive $15,000 for attorneys' fees and costs *or have the court determine the reasonable amount*." (Italics added.) Thus, there is no basis for inferring McKenzie rejected the first offer solely based on a "demand that [he] be allowed to file a [fee] motion." Nor can it be inferred that McKenzie acted unreasonably by choosing to pursue a fee motion rather than accepting the $15,000 lump sum option included in both of Ford's section 998 offers. As we have already stated, McKenzie had already incurred over $28,000 in fees by the time Ford served its first offer – nearly twice the amount Ford was offering to pay without a motion – and the court awarded McKenzie that entire amount in response to the motion. Consequently, the reasonably fees incurred by McKenzie in pursuing its fees should have been included in the award.

Finally, we reject Ford's attempt to magnify the fairly minimal evidence that McKenzie's two attorneys duplicated each other's work in the wake of Ford's initial 998 offer, as a basis for denying those fees altogether. Ford acknowledges that its argument to the trial court had focused solely on alleged duplication of time in the period *after* Ford made its initial offer, because Ford's argument was that McKenzie's counsel had a particular incentive to engage in such conduct once Ford offered to repurchase the vehicle, as it meant a fee award had become virtually assured. And in that argument, Ford actually identified only 2 hours of such duplicative time during that post-offer period. But Ford now argues that because the trial court had McKenzie's counsels' *entire* billing records before it, any alleged instances of duplication occurring prior to the offer would also be relevant in assessing the issue. We disagree. The trial court's finding of duplication was expressly confined to the 42 hours billed by McKenzie's counsel after the offer of compromise. The content of billing prior to that time played no part in that analysis.

15

The trial court's decision to award no fees in the wake of Ford's initial section 998 offer to compromise amounted to an abuse of discretion in the circumstances of this case. Given the extraneous and improper nonfinancial terms incorporated into the "release," Ford included in that proposed compromise McKenzie acted reasonably in rejecting it. And McKenzie's prompt service of a counteroffer with essentially identical financial terms, but stripped of the extraneous provisions, reflected his willingness to complete a settlement. If anything, it was Ford's conduct in allowing McKenzie's offer to lapse, and then later serving its own second offer with essentially identical stripped-down terms – which McKenzie immediately accepted – that delayed the settlement in this case. We consequently reverse the court's fee award, and remand this case with directions to reconsider the amount of fees to be awarded to McKenzie for the period following Ford's initial section 998 offer.

*3. The Other Litigation Costs*

McKenzie also argues the court erred by failing to include in its award any of the other litigation costs he claimed. Ford argues there was no error because the $28,350.08 the court awarded "necessarily includes an award of costs." Not necessarily. In fact, the trial court's order expressly states it is granting McKenzie's "motion *for Attorneys' Fees . . .* at the reduced amount of $28,350.08." (Italics added.) It makes no reference to the other costs claimed. On the other hand, as Ford points out, the amount awarded by the court, which ends in 8 cents, is difficult to reconcile with a pure fee award and can much more easily be understood if we presume the other costs sought by McKenzie were also included.

Because we are reversing the award and remanding to the trial court for recalculation of the fees awardable to McKenzie for the period following service of Ford's section 998 offer, we direct the trial court to also clarify whether its original award

16

was intended to encompass the other costs sought by McKenzie and if it was not, to make an additional award of such costs.

## DISPOSITION

The order is reversed and the case is remanded to the trial court with directions to (1) award McKenzie reasonable attorney fees for the period following service of Ford's initial section 998 offer, including reasonable fees incurred in pursuing his motion for fees; and (2) clarify whether its original award was intended to encompass the other recoverable costs sought by McKenzie and if it was not, to make an additional award of such costs. McKenzie is to recover his costs on appeal.

RYLAARSDAM, J.

WE CONCUR:

O'LEARY, P. J.

BEDSWORTH, J.

17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JAMES McKENZIE, | |
| Plaintiff and Appellant, | G049772 |
| v. | (Super. Ct. No. 30-2012-00573060) |
| FORD MOTOR COMPANY et al., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendants and Respondents. | |

Plaintiff and Appellant James McKenzie, Law Office of Michael E. Lindsey, and Law Offices of Larry R. Hoddick have submitted requests that our opinion filed on June 12, 2015, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED. The opinion is ordered published in the Official Reports.


RYLAARSDAM, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.

18