Filed 9/24/24 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LUIS VALDOVINOS, et al., | B324418 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC633283) |
| v. | |
| KIA MOTORS AMERICA, INC., | ORDER MODIFYING OPINION |
| Defendant and Appellant. | NO CHANGE IN THE JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on August 29, 2024, be modified as follows:

1. On page thirteen, in the first full paragraph, replace the final sentence stating "The choice of remedies is the consumer's to make.  (§ 1793.2, subd. (d)(2).)" with:

    Where, as here, the manufacturer offers replacement

or restitution, the choice of remedies is the consumer's to make.  (§ 1793.2, subd. (d)(2).)

\*     \*     \*

There is no change in the judgment.

_____

ASHMANN-GERST, Acting P. J.   CHAVEZ, J.   HOFFSTADT, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LUIS VALDOVINOS et al., | B324418 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC633283) |
| v. | |
| KIA MOTORS AMERICA, INC., | |
| Defendant and Appellant. | |

APPEALS from a judgment of the Superior Court of Los Angeles County, Steven J. Kleifield, Judge. Affirmed in part, reversed in part, and remanded with directions.

Gupta Wessler, Jessica E. Garland, Jennifer D. Bennett; Knight Law Group and Radomir Roger Kirnos for Plaintiffs and Appellants.

Horvitz & Levy, Lisa Perrochet, Shane H. McKenzie, John B. Sprangers; Lehrman, Villegas, Chinery & Douglas, Kate S.

Lehrman and Jacqueline Bruce-Chinery for Defendant and Appellant.

* * * * * *

California's Song-Beverly Consumer Warranty Act (Civ. Code, § 1790 et seq.)[1] (the Act) spells out the procedures and remedies available to California consumers when the new motor vehicle they purchase is a so-called "lemon." Among other things, the Act obligates the manufacturer, distributor, or retailer of such a vehicle to buy back the defective vehicle as long as the consumer grants it a "reasonable" opportunity to fix the defect, and, if the defect persists, empowers the consumer to sue for breach of any express warranty to obtain "restitution" and, if the violation of the Act is "willful," a civil penalty up to twice the amount of the "restitution" award. (§§ 1793.2, subd. (d), 1794, subd. (c).) The Act is "strongly pro-consumer" (*Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 990 (*Murillo*), superseded on other grounds by Code Civ. Proc., § 998), so restitution under the Act is not the "'plain vanilla common law kind'" that aims to make an injured party whole (*Williams v. FCA US LLC* (2023) 88 Cal.App.5th 765, 780 (*Williams*)); instead, the Act's definition of "restitution" is more like vanilla topped with a generous scoop of pro-consumer sprinkles that can go so far as to entitle consumers to be made *more than whole* and thereby to obtain a windfall from buying a "lemon" (*Niedermeier v. FCA US, LLC* (2024) 15 Cal.5th 792, 801 (*Niedermeier*)).

This appeal presents three questions regarding the breadth of the Act's pro-consumer remedies. First, is a consumer entitled

---

[1]    All further statutory references are to the Civil Code unless otherwise indicated.

to recover as "restitution" amounts paid to a third party for a service contract on the vehicle? Second, is a consumer entitled to recover as "restitution" *all* insurance premiums paid on the vehicle should the consumer continue to drive it (as opposed to only those premiums attributable to coverage against property damage)? Third, is a manufacturer's, distributor's, or retailer's violation of the Act *willful* as a matter of law if the violation was negligent or if it adequately investigated but could not confirm the existence of a defect yet nevertheless offered to buy back the vehicle on terms that were reasonable at the time the offer was made? We hold that the answer to all three questions is "no."

We accordingly (1) reverse the trial court's posttrial orders declining to strike from the "restitution" award the amounts of the service contract and certain amounts of insurance premiums, (2) reverse the trial court's posttrial order striking the civil penalty for insufficient evidence, but (3) affirm the trial court's posttrial order granting a new trial on the civil penalty. We direct the trial court to amend the judgment consistent with this opinion and we remand for a new trial on the civil penalty.

**FACTS AND PROCEDURAL BACKGROUND**

I. **Facts**

A. *Plaintiff buys a 2014 Kia Optima*

On May 10, 2014, Luis Valdovinos (plaintiff) purchased a new 2014 Kia Optima with just 19 miles on it.

The sales contract listed the "Total Sale Price" as $30,127, which included (1) $299 for an "(Optional) Theft Deterrence Device" paid to a third-party company called Security Etch, and (2) $2,298 for an "(Optional) Service Contract" paid to a third-party company called American Financial. Plaintiff made a down

3

payment of $8,000 in cash and received a $2,000 "Manufacturer's Rebate"; he financed the remaining balance of $19,171.

Plaintiff purchased the vehicle from Kia of Cerritos, which is a franchise Kia dealership not owned by Kia Motors America, Inc. (Kia).[2] Kia is a distributor of Kia vehicles.

Plaintiff's Optima had a basic warranty that expired after five years or 60,000 miles, and a drive train warranty that expired after 10 years or 100,000 miles.

**B.** ***Plaintiff starts having problems with his Optima***

1. *August 5, 2014 visit*

In early August 2014, plaintiff had his Optima towed to Kia of Cerritos, and reported that the vehicle would not "go into reverse [gear] intermittently." The dealership mechanics were unable to replicate the problem, and thus were unable to do anything to fix it.

After the dealership forwarded its paperwork to Kia, Kia tried to call plaintiff three times on the days immediately following his August 5, 2014 visit. Plaintiff did not return any of the calls. Although plaintiff later testified he did not remember the voicemails Kia left for him, he did not deny that Kia had tried to reach him.

When Kia received no response from plaintiff, it closed his case.

2. *December 20, 2014 visit*

In mid-December 2014, plaintiff noticed that (1) one of the windows of his Optima was not properly rolling up, and (2) the Optima was still sometimes "not go[ing] in reverse when in the

_____

2    At some point, Kia's corporate name became Kia America, Inc.

reverse gear." Plaintiff brought the vehicle into the dealership on December 20, 2014. The dealership mechanics repaired the window, but "could not duplicate" the gear-shifting problem and found "no codes in [the] system" after hooking the car up to diagnostic computers; the dealership consequently concluded the "vehicle [was] working as designed."

Although the dealership's paperwork contained no contemporaneous notation, plaintiff testified at trial that his Optima would not go into reverse when he was leaving the dealership during his December 2014 visit, that plaintiff summoned an unknown "individual" who had given him "all the paperwork," that the individual then summoned his "supervisor," that the three of them pushed the vehicle back to the service garage, and that no mechanic could find any problem.

### C. *Plaintiff's first buyback request*

On January 12, 2015, plaintiff called Kia to inform the distributor that he took his Optima to the dealership because it had "not go[ne] into reverse," that the dealership had been "unable to duplicate" the issue and thus "cannot find what is wrong," and demanded that Kia buy back his car. Although Kia's paperwork contains no contemporaneous notation, plaintiff testified at trial that he also told Kia on that call that two dealership employees had witnessed the defect as plaintiff was leaving the December 2014 appointment.

In response to plaintiff's calls, Kia re-opened plaintiff's case and arranged for a Kia field technician to examine his Optima at the dealership. The technician examined plaintiff's Optima on February 16, 2015. Unable to duplicate the concern, the technician installed a "flight recorder" to plaintiff's Optima to record its transmission's operation. The technician removed the

5

flight recorder in late March 2015, and reviewed the data. The data "indicate[d] that [the] transmission is operating correctly."

In light of its inability to verify any defect with plaintiff's Optima, Kia denied plaintiff's request for a buyback.

**D.** *Plaintiff's further visits to the dealership prior to Kia's first offer*

Between April 2015 and December 2015, plaintiff brought his Optima to the dealership three more times. During an October 14, 2015 visit, plaintiff did not mention anything about the car's intermittent failure to go in reverse. During a November 10, 2015 visit, plaintiff reported that his Optima would "los[e] power" and would "not go into reverse sometimes." The dealership mechanics were unable to duplicate that issue after driving the car for two miles. The dealership recommended that plaintiff install the flight recorder again, but he declined. During a December 9, 2015 visit, plaintiff again reported that the car would "intermittently" not go into reverse. The dealership mechanics were unable to duplicate the issue, even after updating the software governing the Optima's transmission.

In early February 2016, Kia offered to refund plaintiff five of his monthly car payments for his inconvenience. Plaintiff rejected the offer.

**E.** *Kia's formal offer to replace or repurchase plaintiff's Optima*

On February 9, 2016, Kia sent plaintiff an offer letter that presented him with three options—namely, Kia offered to (1) replace plaintiff's vehicle with a "comparable" Optima; (2) repurchase plaintiff's vehicle by (a) paying him $11,800.36, and (b) paying off the outstanding balance of his loan on the Optima; or (3) send a field technician "for the purpose of inspecting and

6

repairing the vehicle" along with paying plaintiff $10,000 "as a one-time goodwill gesture" for plaintiff to accept as a full settlement. The $11,800.36 repurchase amount in the second option was calculated as the sum of plaintiff's $8,000 down payment plus $6,709 in monthly payments plaintiff had already made, less a $299 deduction for the third-party security device, a $2,299 deduction for the third-party service contract, and a $310.64 deduction for the 1,533 miles on the Optima at the time of plaintiff's first visit to the dealership reporting the problem in August 2014. The offer letter explained that the first and second options were "contingent on [a] physical inspection of the vehicle for damage and/or excessive wear and tear," and that plaintiff would be "required" to provide a cashier's check for any diminution in value. (The Optima had no damage at this time.) The offer letter also explained that plaintiff would be "require[d]" to "sign[] [a] settlement release agreement" but did not provide further details on the content of that agreement. The offer letter asked plaintiff to select which option he preferred and to sign the letter, but contemplated that it would take "45-60 days" to "complet[e] . . . this process."

The letter declared the "[o]ffer [v]alid" for one week.

The offer lapsed without any response from plaintiff.

**F.     *Postoffer visits to the dealership***

Other than bringing his Optima into the dealership for an oil change in late August 2016, plaintiff's next action was to sue Kia under the Act.

Plaintiff nevertheless continued to use the car, albeit on a more "limited" basis, through March 2022. During the five and a half years between plaintiff's initiation of his lawsuit and his decision to stop driving the car, plaintiff brought the Optima into

7

Kia dealerships 10 more times—in October 2017, in January 2018, in April 2018, in August 2018, in October 2018, in November 2018, in May 2019, in September 2019, in July 2020, and in August 2021. Plaintiff mentioned issues with his transmission during four of those visits (in April 2018, October 2018, November 2018, and May 2019), including the one visit (in April 2018) to conduct an inspection as part of the discovery for this lawsuit. The dealership mechanics were unable to replicate the defect plaintiff reported, despite test driving the car for extended periods during these visits. However, plaintiff's expert witness later testified that he personally experienced a transmission defect while driving the Optima to the April 2018 inspection.

## II.     Procedural Background

### A.     *Complaint*

On September 8, 2016, plaintiff sued Kia for violating the Act.[3]

### B.     *Trial*

The matter did not proceed to trial until May 2022.

At trial, plaintiff introduced a video that was filmed in 2019 showing the problems with his Optima's reverse gear. Plaintiff also (1) introduced insurance bills from three policy years (half of 2014, 2015-2016, and 2021-2022); and (2) testified that he paid approximately $1,364 in premiums each year to insure the Optima between 2015 and March 2022.

Kia did not put on any defense witnesses or evidence.

After just two hours of deliberations, the jury returned a special verdict finding that Kia violated the Act by breaching the

---

[3]     The suit was also brought by plaintiff's son, Luis J. Valdovinos.

8

express warranty as well as the implied warranty of merchantability. The jury awarded plaintiff restitution of $42,568.90 comprised of the $30,127 "purchase price of the vehicle" plus $12,912 in "incidental and consequential damages" minus $380.10 for mileage. The jury also found that Kia's violation of the Act was "willful[]" and awarded twice the restitution amount—$85,317.80—as a civil penalty. The total verdict for plaintiff was $127,976.70.

### C. *Postverdict litigation*

#### 1. *First round of postjudgment motions*

Following entry of judgment, Kia filed a motion for judgment notwithstanding the verdict (JNOV) and a motion for new trial. As pertinent to this appeal, Kia argued that (1) restitution should not include the amounts for (a) the manufacturer's rebate, (b) the third-party theft deterrent device, (c) the third-party service contract, and (d) any insurance premiums paid prior to the second time plaintiff brought his Optima to the dealership; and (2) there was insufficient evidence that Kia "willfully" violated the Act for purposes of the civil penalty. After full briefing and a hearing on August 29, 2022, the trial court accepted plaintiff's election to receive damages only for breach of the express warranty and issued a written order denying the JNOV and new trial motions on the first ground regarding restitution but granting the JNOV and new trial motions on the second ground regarding the civil penalty. With respect to its grant of relief on the JNOV motion, the court explained that a distributor does not "willfully" violate the Act if it has a "good faith and reasonable belief" that it has not violated the Act, and found "no substantial evidence that Kia knew that the [Optima] had a defect that it could not repair" because "Kia

9

could not confirm that there was a defect."  With respect to its grant of relief on the new trial motion, the court explained that it "sits as a 'thirteenth juror'" and that, if the JNOV ruling is "reversed on appeal," it "concurrently grants a partial new trial solely on the claim for civil penalties."

### 2.    *Second round of posttrial motions*

After the trial court issued an amended judgment that struck the civil penalty, Kia filed another motion for a partial JNOV on the same grounds regarding amounts that should be excluded as restitution, but further specified that any premiums pertinent to insurance for *using* the car (as opposed to premiums for coverage that preserved its value as property) were not recoverable.  Following a full round of briefing, the trial court issued a minute order summarily denying the motion.

## D.    *Appeals*

Plaintiff filed a notice of appeal challenging the trial court's amended judgment, and Kia thereafter filed a notice of cross-appeal.

# DISCUSSION

## I.    The Law, Generally

### A.    *The Act*

The Act, which is also known as California's "lemon law," is a "strongly pro-consumer" and "'remedial'" statutory scheme meant to grant additional remedies to California consumers saddled with defective products and, in particular and as pertinent here, defective new vehicles.  (*Murillo*, *supra*, 17 Cal.4th at p. 990; *Niedermeier*, *supra*, 15 Cal.5th at p. 804; §§ 1790.3, 1790.4; *Anderson v. Ford Motor Co.* (2022) 74 Cal.App.5th 946, 970-971 (*Anderson*).)

1. *Liability, generally*

To achieve its ends, and as pertinent here, the Act (1) requires all manufacturers, distributors, and retailers of "consumer goods" to extend an implied warranty of merchantability to consumers that assures that goods are "fit for the ordinary purposes for which [they] are used" (§§ 1791.1, subds. (a)(2) & (b), 1792, 1792.2, 1793); and (2) regulates how any express warranties are created and enforced (§§ 1793.1, 1793.2, 1793.3, 1795). Breaches of implied and express warranties are distinct, and each has its own remedies. (*Brand v. Hyundai Motor America* (2014) 226 Cal.App.4th 1538, 1548.)

2. *Breach of an express warranty*[4]

Although the Act regulates "consumer goods" generally (see §§ 1793.2, subds. (a), (c) & (d)(1), 1793.3, 1795), the Act has a provision—namely, section 1793.2, subdivision (d)(2)—that specifically regulates express warranties on "new motor vehicle[s]." (*Niedermeier, supra,* 15 Cal.5th at p. 807, fn. 4 [noting how this provision differs from the general provisions regarding express warranties]; *Cummins, Inc. v. Superior Court* (2005) 36 Cal.4th 478, 485 ["new motor vehicle" provision added in 1982]; § 1793.22, subd. (e)(2) [defining "new motor vehicle"]) Specifically, a "manufacturer" of a "new motor vehicle" or "its

---

**4**      Because plaintiff affirmatively elected to recover only the Act's remedies for breach of an *express* warranty, the Act's provisions on implied warranties (see generally §§ 1794, subd. (a), 1791.1, subd. (d); Cal. U. Comm. Code §§ 2711-2715; *Music Acceptance Corp. v. Lofing* (1995) 32 Cal.App.4th 610, 620-621) are no longer at issue in this case. We will not discuss them further.

11

representative in this state"[5] breaches an express warranty under the Act if (1) the consumer (which includes buyers or lessees) "deliver[s]" the "nonconforming" vehicle to an authorized "service and repair facility" (§ 1793.2, subds. (c) & (d)(2); *Niedermeier*, at p. 818); (2) the manufacturer is given a "reasonable number of attempts"—that is, a reasonable number of *opportunities*—to "service or repair [the vehicle] . . . to conform to the applicable express warrant[y]" (§ 1793.2, subd. (d)(2); *Robertson v. Fleetwood Travel Trailers of California, Inc.* (2006) 144 Cal.App.4th 785, 799 (*Robertson*) [only a "'reasonable *opportunity*'" is required, "even if no repairs are actually undertaken"]); and (3) there is still a nonconformity that "substantially impairs the use, value, or safety of the new motor vehicle" to the consumer (§ 1793.22, subd. (e)(1); *Ramos v. Mercedes-Benz USA, LLC* (2020) 55 Cal.App.5th 220, 222 [no breach where "defect [does] not substantially impair the vehicle's use, value or safety"]).  Where a "new motor vehicle" has less than 18,000 miles on its odometer or the consumer took delivery less than 18 months prior, the Act defines a "reasonable number of attempts" as (1) "two or more" if the "nonconformity results in a condition that is likely to cause death or serious bodily injury" and "the [consumer] has at least once directly notified the manufacturer of the need for the repair," or (2) "four or more" in any other case if "the [consumer] has at least once directly notified the manufacturer of the need for the repair."  (§ 1793.22, subd. (b).)

---

[5]     While Kia is a distributor, we will use the term "manufacturer" for the sake of simplicity and for consistency with the language of the Act.

12

Upon a breach, the manufacturer has an "affirmative duty" to either (1) "replace the [consumer's] vehicle with a new motor vehicle substantially identical to the vehicle replaced" (along with providing the same warranties and covering all taxes and fees attendant to new cars) (§ 1793.2, subd. (d)(2)(A)); or (2) "promptly make *restitution* to the [consumer]" (*id.*, subd. (d)(2), italics added). (*Krotin v. Porsche Cars North America, Inc.* (1995) 38 Cal.App.4th 294, 303.) This duty exists even if the consumer never requests it (*Santana v. FCA US, LLC* (2020) 56 Cal.App.5th 334, 347 (*Santana*); *Krotin*, at p. 303), even if the consumer no longer possesses the vehicle (*Martinez v. Kia Motors America, Inc.* (2011) 193 Cal.App.4th 187, 194), and even if the "cause of the purported defect" is not "establish[ed]" (*Mikhaeilpoor v. BMW of North America, LLC* (2020) 48 Cal.App.5th 240, 255 (*Mikhaeilpoor*)). The choice of remedies is the consumer's to make. (§ 1793.2, subd. (d)(2).)

If a manufacturer does not comply with the Act, the consumer may sue. (§ 1794, subd. (a).)

### a. Restitution

In the ensuing lawsuit, a consumer may recover "restitution" for the breach of the express warranty as to a new motor vehicle. (§ 1793.2, subd. (d)(2).) For these purposes, the Act specially defines "restitution" as (1) "the actual price paid or payable by the [consumer], including any charges for transportation and manufacturer-installed options," as "determined at the time of the vehicle's purchase"; plus (2) "collateral charges," "such as sales or use tax, license fees, registration fees, and other official fees"; plus (3) "incidental damages." (*Id.*, subd. (d)(2)(B); *Niedermeier*, *supra*, 15 Cal.5th at p. 808; see generally *Niedermeier*, at p. 809 ["restitution" under

13

the Act is a "term of art separate from the evolving common law concept that shares the name"].)  The Act permits a manufacturer to subtract from the amount of "restitution" (1) the cost of any "nonmanufacturer items installed by a dealer or the [consumer]" (§ 1793.2, subd. (d)(2)(B)); and (2) any "amount[s] directly attributable to use by the [consumer]"—chiefly, use attributable to mileage—prior to the consumer "first deliver[ing] the vehicle to the manufacturer or distributor, or its authorized service and repair facility[,] for correction of the problem" based on a statutorily prescribed formula (§ 1793.2, subd. (d)(2)(C)). Because these are the sole authorized deductions, a manufacturer may not subtract any other deductions, including money a consumer receives for trading in the vehicle, even if that ends up giving the consumer a "windfall" of a total recoupment in excess of the actual price paid for the car.  (*Niedermeier*, at p. 801; *Williams*, *supra*, 88 Cal.App.5th at pp. 785-786 [the Act permits consumer to "receive a financial windfall"].)

> b.     Civil penalty

If the manufacturer's "failure to comply [with the Act] was *willful*," the consumer may also obtain a "civil penalty" up to "two times the amount of" the "restitution" award.  (§ 1794, subd. (c), italics added.)[6]

---

[6]     The Act has a separate provision barring the award of a civil penalty if the manufacturer "maintains a qualified third-party dispute resolution process" and the consumer invokes that process in writing.  (§ 1794, subd. (e)(2).)  Because this provision was not invoked here, and because this provision is cumulative to the general civil penalty provision (*Jernigan v. Ford Motor Co.* (1994) 24 Cal.App.4th 488, 491-492), we need not discuss this alternative further.

14

c. Reasonable costs

If the consumer prevails in a lawsuit under the Act, the consumer may also recover "costs and expenses," which include "attorney's fees based on actual time expended, determined by the court to have been reasonably incurred by the [consumer] in connection with the commencement and prosecution" of the lawsuit. (§ 1794, subd. (d).)

## B. *Posttrial motions*

### 1. *JNOVs*

A motion for JNOV may be granted if the verdict (1) is not supported by substantial evidence, or (2) is incompatible with the law. (Code Civ. Proc., § 629.)

Where the challenge to the verdict raises questions regarding the substantiality of the evidence, the trial court's role is "severely limited." (*Teitel v. First Los Angeles Bank* (1991) 231 Cal.App.3d 1593, 1603 (*Teitel*).) That is because relief may be granted only if it appears from the record—viewed in the light most favorable to the party securing the verdict and without any reweighing of the evidence or judging of witness credibility—that there is *no* substantial evidence to support the verdict. (*Teitel*, at pp. 1602-1603.) On appeal, we independently examine whether a trial court granting relief on this ground correctly concluded that no substantial evidence supports the jury's findings. (*Hirst v. City of Oceanside* (2015) 236 Cal.App.4th 774, 782 (*Hirst*).)

Where the challenge to the verdict raises purely legal questions, we independently review a trial court's JNOV ruling. (*Hirst*, *supra*, 236 Cal.App.4th at p. 782.) Such questions include the legal viability of a category of damages (*Hensley v. San Diego Gas & Electric Co.* (2017) 7 Cal.App.5th 1337, 1346), as well as the attendant interpretation of any statutes (*Niedermeier*, *supra*,

15 Cal.5th at p. 804).[7]  "As with all cases of statutory interpretation, "'[w]e first examine the statutory language, giving it a plain and commonsense meaning"'" and examining it in context.  (*Niedermeier*, at p. 804.)  If that statutory language is unambiguous, "'there is no need . . . to resort to indicia of the intent of the Legislature' to interpret the statute."  (*Ibid.*)

### 2.    *New trial*

A motion for new trial may be granted where, as pertinent here, there is "[i]nsufficien[t]" evidence "to justify the verdict." (Code Civ. Proc., § 657, subd. (6).)  When a party seeks a new trial on this ground, the trial court sits as a thirteenth juror who is empowered to reweigh the evidence and to decide whether, *in its view*, the weight of the evidence supports a different finding than the jury's and hence justifies a new trial.  On appeal, we generally review the grant of a new trial for an abuse of discretion but specifically review whether substantial evidence supports *the trial court's* different finding.  (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 636 (*Oakland Raiders*); *Johnson & Johnson Talcum Powder Cases* (2019) 37 Cal.App.5th 292, 335-336 (*Johnson & Johnson*).)  In so doing, we presume the trial court's finding is correct, and that presumption is overcome only if the opposing party demonstrates that no reasonable finder of fact—viewing the evidence in the light most favorable *to the trial court's finding*—could have found for the

---

[7]    We accordingly reject plaintiff's assertion that Kia's challenge to the "restitution" award may be reviewed only under the "[e]xcessive or inadequate damages" ground of the new trial statute.  (Code Civ. Proc., § 657, subd. (5).)  This assertion ignores that Kia is challenging the *legal* validity of the damages award, not its factual sufficiency.

moving party on the trial court's theory. (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 412 (*Lane*).) Where, as here, the trial court's finding is made against the party bearing the burden of proof, this standard is met only where the evidence compels a finding contrary to the trial court's as a matter of law. (*Estate of Berger* (2023) 91 Cal.App.5th 1293, 1307.)

We may separately analyze a new trial order if we determine that an order granting a JNOV must be reversed. (*Johnson & Johnson*, *supra*, 37 Cal.App.5th at p. 336.)

## II.    The "Restitution" Award

Kia argues that the trial court erred in denying its posttrial motions seeking to reduce the jury's "restitution" award by the amount of (1) the $2,000 manufacturer's rebate; (2) the two optional items supplied by third parties—namely, (a) the $299 theft deterrent device, and (b) the $2,298 optional service contract—and (3) the insurance premiums plaintiff incurred (a) for coverage prior to December 2014, and (b) for any coverage other than property damage. Plaintiff concedes on appeal that the $2,000 manufacturer's rebate, the $299 theft deterrent device, and insurance premiums incurred for coverage prior to December 2014 are not recoverable under the Act. Thus, we need only decide whether the optional service contract and the full amount of the post-December 2014 insurance premiums are properly awarded as "restitution" under the Act as (1) part of the "actual price paid or payable by the [consumer]," (2) collateral charges, or (3) incidental damages.

### A.    *Optional service contract*

#### 1.    *Actual price paid*

As pertinent here, the Act provides that a consumer may recover as "restitution" from a manufacturer "the actual price

17

paid or payable by the [consumer]," and goes on to specify that this amount "includ[es] any . . . manufacturer-installed options" but "exclud[es] nonmanufacturer items installed by a dealer or the [consumer]." (§ 1793.2, subd. (d)(2)(B).) Because the optional service contract for plaintiff's Optima was supplied by American Financial, it is *not* a "manufacturer-installed option[]" and is instead a "nonmanufacturer item installed by" someone else; under the plain text of the Act, the optional service contract is not part of the "actual price paid" by plaintiff for his Optima. Although no published California decision has come to this conclusion, the federal courts applying the Act have uniformly come to this conclusion for this very reason. (*Hernandez v. FCA US LLC* (C.D. Cal., March 18, 2022, 1:21-cv-0745) 2022 U.S. Dist. LEXIS 49190, *10-*11; *Herrera v. Ford Motor Co.* (C.D. Cal., Feb. 24, 2022, CV 21-4731) 2022 U.S. Dist. LEXIS 33002, *14; *Carillo v. FCA USA, LLC* (C.D. Cal. 2021) 546 F. Supp. 3d 995, 1002; *Rupay v. Volkswagen Group of America, Inc.* (C.D. Cal., Nov. 15, 2012, CV 12-4478) 2012 U.S. Dist. LEXIS 180404, *17.)

Plaintiff resists this conclusion, asserting that the Act's language only refers to *physical* items that can be "installed" in a vehicle, that a service contract is not a physical item, and that excluding nonphysical items like service contracts from the "actual price paid" would impermissibly rewrite the Act. We disagree. Textually, the Act defines two sides of the same coin— that "the actual price paid" *includes* "manufacturer-installed *options*" but *excludes* "nonmanufacturer-installed *items*"—yet the terms "options" and "items" can refer to physical or nonphysical things and are not otherwise expressly limited to only those options and items that have tangible corporeality. The Act's use of the term "installed" cannot bear the weight plaintiff ascribes to

18

it.  (Accord, CACI No. 3241 [excluding from the "purchase price" "any charges for items *supplied* by someone other than [the manufacturer]"], italics added.)  Contextually, the "actual price paid" is consideration for *the vehicle*; the service contract is not paid in exchange *for the vehicle*, it is instead an add-on supplied by someone else.  (See *Kirzhner v. Mercedes-Benz USA, LLC* (2020) 9 Cal.5th 966, 972-973 (*Kirzhner*) [defining "consideration"].)  Practically, plaintiff's construction would obligate manufacturers to pay restitution for any nonphysical items purchased from third parties, such as satellite radio subscriptions.  Although the Act's definition of "restitution" tosses on some pro-consumer sprinkles, plaintiff's broad construction would convert that definition into a full-blown pro-consumer sundae without any textual mandate for doing so.  (*Nunez v. FCA US LLC* (2021) 61 Cal.App.5th 385, 397 [despite the Act's ""manifestly"" pro-consumer purpose, courts "may [not] disregard ""the actual words of the statute,"" or fail to give them ""a plain and commonsense meaning"""].)

### 2. *Collateral charges*

"Restitution" under the Act also includes "collateral charges."  (§ 1793.2, subd. (d)(2)(B).)  As the name suggests, these are charges *collateral* to—and thus, part and parcel with—the purchase of the new vehicle itself.  (*Kirzhner*, *supra*, 9 Cal.5th at p. 973 ["collateral charges" reach "charges and expenses" that are "part of" and that "accompany the price of the vehicle"].)  Thus, the Act expressly defines "collateral charges" to include "sales or use tax, license fees, registration fees, or other official fees" paid as part of, and at the time of, the sale.  (§ 1793.2, subd. (d)(2)(B).)  Courts have further defined the term to include finance charges on any purchase loan for the car.  (*Kirzhner*, at p. 973; *Robertson*,

19

*supra*, 144 Cal.App.4th at p. 814.) But "collateral charges" do not include "all charges and expenses that may later be incurred in connection with the ownership or use of [a] vehicle." (*Kirzhner*, at p. 973.) Thus, collateral charges do not include the fees a buyer pays to renew the car's registration *after the purchase.* (*Id.* at p. 977.) Here, plaintiff's purchase of an *optional* service contract is not a charge collateral to the sale because it is not part and parcel with the purchase of the vehicle itself, as consumers have the option of forgoing such service contracts.

### 3. *Incidental damages*

"Restitution" under the Act also includes "incidental damages." (§ 1793.2, subd. (d)(2)(B).) Although the Act defines "incidental damages" as "including, but not limited to, reasonable repair, towing, and rental car costs actually incurred by the [consumer]" (*ibid.*), the Act also cross-references—and hence incorporates—the Commercial Code's definition, which reaches costs "incurred in inspection, receipt, transportation and care and custody" of the vehicle (*ibid.*; § 1794, subd. (b)(2); Cal. U. Com. Code, § 2715, subd. (1); *Kirzhner*, *supra*, 9 Cal.5th at pp. 974-975, 979). In *Kirzhner*, our Supreme Court held that costs that qualify as recoverable "incidental damages" must (1) be "incurred in the 'inspection, receipt, transportation and *care and custody*' of [the] vehicle"; (2) "'result[] from' or [be] incurred 'incident to' a manufacturer's breach of warranty or other violation of the Act"; and (3) be "'reasonably incurred.'" (*Kirzhner*, at p. 979, italics added.) In determining which costs qualify as those incurred for the "care and custody" of a vehicle, *Kirzhner* drew a distinction between costs incurred *for the manufacturer's benefit* (defined as costs incurred to "preserv[e] and maintain" the vehicle and "protect [it] from damage or theft" "pending [its] return to the

20

[manufacturer]" while the consumer acts as a sort of bailee) and costs incurred *for the consumer's benefit* (defined as costs incurred to make it possible to "drive the vehicle and keep it operational" pending its return); the former are recoverable as incidental damages under the Act, but the latter are not. (*Id.* at pp. 979-982; *Lanners v. Whitney* (1967) 428 P.2d 398, 404 [drawing distinction between costs to maintain nonconforming airplanes from costs incurred to fly the airplanes, which is discussed favorably in *Kirzhner*].) Because an optional service contract functions as a prospective payment for the costs of keeping a vehicle serviced—and hence operational and able to be driven—it is for the consumer's benefit (not the manufacturer's), and accordingly does not satisfy *Kirzhner*'s prerequisites for recovery as "incidental damages" under the Act.

### B. *Insurance premiums*

Because plaintiff's payments for insurance premiums were by definition incurred *after* he purchased the Optima, they are neither part of the "actual price paid" nor "collateral charges." (See *Kirzhner*, *supra*, 9 Cal.5th at p. 977 [legally required registration renewal fees are "not recoverable as collateral charges"].) Thus, the issue comes down to whether the full amount of insurance premiums plaintiff paid between Kia's conceded violation of the Act in December 2014 (after the second opportunity to repair the defect) and March 2022 (when plaintiff stopped driving the car) qualify as "incidental damages."

The *full* amount of the insurance premiums are not "incidental damages." Consistent with *Kirzhner*'s distinction between postviolation costs incurred for the manufacturer's benefit and postviolation costs incurred for the consumer's benefit, consumers may recover as "incidental damages" only

21

those insurance premiums incurred to "safeguard the vehicle from damage due to a collision, theft, vandalism, fire, and similar risks" because those would "reduce the value of the manufacturer's interest in the vehicle." (*Crayton v. FCA US LLC* (2021) 63 Cal.App.5th 194, 209 (*Crayton*).) Thus, only "payments of property damage premiums" are recoverable as "incidental damages" (*ibid.*); payments for liability insurance attendant to the *use* of the vehicle are not recoverable. The trial court therefore erred in not striking from the "restitution" award amounts that plaintiff paid for liability-related insurance premiums.

Plaintiff responds with three arguments. First, he argues that Kia waived its right to object to the award of insurance premiums paid for liability-related insurance by not raising this distinction until its second posttrial motion. Although the failure to raise the issue during trial necessitates further proceedings to nail down how the distinction applies to the facts of this case, the chief question raised by Kia's appeal—were these premiums improperly awarded?—is a question of law raised below and that we may consider for the first time on appeal even if it was not. (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 699-700.) Second, plaintiff argues that California law requires drivers to maintain liability insurance and uninsured/underinsured driver's insurance. (Ins. Code, § 11580.1, subds. (a) & (b)(1).) That may be so, but that requirement only kicks in if a consumer elects *to drive the vehicle*, which is up to the consumer (since a car can be garaged without insurance) and in no way benefits the manufacturer. Third, and citing *Mai v. HKT Cal, Inc.* (2021) 66 Cal.App.5th 504, 519-520, plaintiff argues that his presentation of some insurance bills

along with his trial testimony establish a prima facie case of entitlement to recover the entirety of his insurance premiums. But the issue here is whether plaintiff carried his burden of proof (not merely his burden of production to establish a prima facie case) on the full amount of his recoverable insurance premiums; because the bills submitted include some liability insurance, the jury's "restitution" award overcompensates plaintiff.

Although the line between insurance premiums incurred to protect against damage to the vehicle and premiums incurred to enable use of the vehicle was clear at the time *Crayton* was decided, the evidence plaintiff adduced at trial does not enable us to parse apart the recoverable premiums from the nonrecoverable premiums for the period from December 2014 to March 2022. Accordingly, plaintiff's recovery of insurance premiums as incidental damages is limited to only those property damage premiums he specifically established, which is $1,595 for the 2015-2016 and 2021-2022 policy periods. (See *Teitel*, *supra*, 231 Cal.App.3d at p. 1605, fn. 6 [JNOV "for an amount less than the jury verdict" only appropriate "where there can be no dispute as to the amount"]; *Cardinal Health 301 Inc. v. Tyco Electronics Corp.* (2008) 169 Cal.App.4th 116, 153 ["If the plaintiff had a 'full and fair opportunity' to present the supporting evidence, and the evidence was insufficient as a matter of law to support a damage award, a reviewing court may strike the award without ordering a retrial"]; *Licudine v. Cedars-Sina Medical Center* (2016) 3 Cal.App.5th 881, 889-900 ["a trial 'is not a practice run'" so "[i]f the plaintiff did not adduce sufficient evidence in the first trial," they should not "be given a second bite at the apple"]; *Gillan v. City of San Marino* (20076) 147 Cal.App.4th 1033, 1053 [rule that "a defendant who fails to request a special verdict segregating the

23

elements of damages forfeits the right to challenge a separate element of damages on appeal" not applicable where the defendant asserts the award of damages necessarily exceeds what is recoverable under the plaintiff's claims], disapproved on other grounds by *Leon v. County of Riverside* (2023) 14 Cal.5th 910, 931.)

### C. *Remedy*

The trial court is accordingly directed to further amend the judgment for plaintiff by striking the following amounts from the "restitution" award:

– $2,000 (based on plaintiff's concession to eliminate the cost of the manufacturer's rebate);

– $299 (based on plaintiff's concession to eliminate the cost of the theft deterrent device);

– $2,298 (based on our holding that the cost of the optional service contract is not recoverable); and

– All but $1,595 for the recoverable insurance premium payments (based on plaintiff's concession to eliminate the cost of premiums paid prior to Kia's breach and based on our holding that plaintiff can recover only the cost of property damage premiums plaintiff proved).

## III. The Civil Penalty

Plaintiff argues that the trial court erred in striking the civil penalty from the jury verdict. As noted above, the Act authorizes a civil penalty if the "failure to comply [with the Act] was *willful*." (§ 1794, subd. (c), italics added.)

### A. *Willfulness*

#### 1. *The standard*

The term "willful" is a chameleon, a "slipper[y]" term of art that changes to suit the context in which it is used. (*Kwan v.*

24

*Mercedes-Benz of North America, Inc.* (1994) 23 Cal.App.4th 174, 183 (*Kwan*).)  Because a "willful" violation of the Act is what triggers the Act's civil penalty, the term "willful" necessarily draws its meaning from the purposes of that civil penalty.  The courts have identified three such purposes.  First, the Act's civil penalty is intended to function as an "important" "deterrent to deliberate violations" of the Act.  (*Kwan*, at p. 184; cf. *Jiagbogu v. Mercedez-Benz USA* (2004) 118 Cal.App.4th 1235, 1244 (*Jiagbogu*) ["Interpretations that would significantly vitiate a manufacturer's incentive to comply with the Act should be avoided"]; *Niedermeier, supra,* 15 Cal.5th at p. 821 [same].)  Second, the Act "establishes a two-tier system of damages for willful and nonwillful violations" of the Act that must remain distinct and not be blurred.  (*Kwan*, at p. 184; *Kirzhner, supra,* 9 Cal.5th at p. 984 [so noting].)  Lastly, the Act's civil penalty is "akin to punitive damages" and hence meant to be "imposed as punishment" in addition to "[to] deter[]."  (*Kwan*, at pp. 184-185; see *Naranjo v. Spectrum Security Services, Inc.* (2024) 15 Cal.5th 1056, 1075 (*Naranjo*) ["the purpose of imposing civil penalties is typically, as with punitive damages, not primarily to compensate, but to deter and punish"].)

The courts have articulated and examined several possible definitions of what it means for a manufacturer to "willful[ly]" violate the Act.  Those definitions exist along a spectrum from most to least onerous.

### a.     Deliberate violations of the Act

While a *deliberate* violation of the Act—that is, where the party sued maliciously and in a blameworthy manner failed to comply with the Act—certainly constitutes a "willful" violation, such moustache-twirling malevolence is not *required* to show

25

"willfulness."  (*Suman v. BMW of North America, Inc.* (1994) 23 Cal.App.4th 1, 12 (*Suman*); *Ibrahim v. Ford Motor Co.* (1989) 214 Cal.App.3d 878, 894 (*Ibrahim*); *Kwan*, *supra*, 23 Cal.App.4th at p. 181.)

> b. Knowing violations of the Act

As with deliberate violations, a *knowing* violation of the Act—that is, where the manufacturer is subjectively aware that it is violating the Act—also constitutes a "willful" violation (see *Hatheway v. Industrial Acc. Com. of Cal.* (1939) 13 Cal.2d 377, 380-381), but such knowledge is not *required* to show "willfulness" (*Kwan*, *supra*, 23 Cal.App.4th at p. 185).

> c. Unknowing violations of the Act, where manufacturer has a reasonable, good faith belief that it is complying

A manufacturer does not act "willfully" if its failure to comply with the Act is an "honest mistake" because it "acted with a good faith and reasonable belief" that it was complying.  (*Kwan*, *supra*, 23 Cal.App.4th at p. 185; *Oregel v. American Isuzu Motors, Inc.* (2001) 90 Cal.App.4th 1094, 1104 (*Oregel*); *Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 136 (*Jensen*); accord, *Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 996-997 ["courts refuse to impose civil penalties against a party who acted with a good faith and reasonable belief in the legality of his or her actions"].)  Immunizing such manufacturers from liability for the Act's civil penalty makes sense because "[t]hose who proceed on a reasonable, good faith belief that they have conformed their conduct to the law's requirements do not need to be deterred from repeating their mistake, nor do they reflect the sort of disregard of the requirements of the law and respect for others' rights that penalty provisions are frequently designed to

26

punish." (*Naranjo, supra*, 15 Cal.5th at p. 1075.)  Under this standard, a manufacturer is not acting with a good faith and "reasonable" belief if it is acting like an ostrich by refusing to "use . . . reasonably available information germane to [its] decision" and thus is remaining deliberately ignorant.  (*Kwan*, at p. 186; *Figueroa v. FCA US, LLC* (2022) 84 Cal.App.5th 708, 715 (*Figueroa*) [manufacturer who "turn[s] a blind eye to a problem" cannot "claim innocence" and avoid the Act's civil penalty premised on willfulness].)

Applying this standard, "a violation [of the Act] is not willful if the [manufacturer's] failure to replace or refund was the result of a good faith and reasonable belief the facts imposing the statutory obligation were not present," such as when "the manufacturer reasonably believed the product *did* conform to the warranty, or a reasonable number of repair attempts had not been made, or the [consumer] desired further repair rather than replacement or refund."  (*Kwan, supra*, 23 Cal.App.4th at p. 185.)

### d.    Negligent violations of the Act

A manufacturer's *negligent* failure to comply with the Act is not "willful."  (*Kirzhner, supra*, 9 Cal.5th at p. 984 ["the Act creates a 'two-tier system of damages' for *willful* and *negligent* violations of any of the Act's affirmative obligations"], italics added.)

Plaintiff resists this conclusion, urging that negligent violations of the Act *are* willful violations because violations committed "with a good faith and *reasonable* belief" *are not* willful, such that *unreasonable* violations *are* willful.

We reject this argument for what boils down to two reasons.

27

First, the net effect of plaintiff's argument is to substitute the word "willful" in section 1794, subdivision (c), with "negligent." Yet these two concepts are antithetical to one another. (*Donnelly v. Southern Pacific Co.* (1941) 18 Cal.2d 863, 869 ["Willfulness and negligence are contradictory terms"]; *J. C. Penney Casualty Ins. Co. v. M.K.* (1991) 52 Cal.3d 1009, 1021 ["'It is settled that "willful act" [under the statute at issue] means "something more than the mere intentional doing of an act constituting [ordinary] negligence"'"]; *McLaughlin v. Richland Shoe Co.* (1988) 486 U.S. 128, 133 [willfulness "is generally understood to refer to conduct that is not merely negligent"].) We decline to treat them as synonymous, where doing so would impermissibly blur the two tiers of remedies under the Act. Instead, we honor our Legislature's choice to use the word "willful" instead of "negligent" in section 1794, subdivision (c).

Second, plaintiff's argument rests on an erroneous premise. He plucks the word "reasonable" out of a phrase used to describe when conduct *is not* willful (namely, when the manufacturer acts "with a good faith and *reasonable* belief"), and then asserts that un-"reasonable" conduct *is* therefore willful. But this ignores the *context* in which the word "reasonable" appears. (Cf. *Skidgel v. Cal. Unemployment Ins. Appeals Bd.* (2021) 12 Cal.5th 1, 14 [when interpreting a statute, "'we construe the words in question in context, keeping in mind the statute's nature and obvious purposes'"].) This is fallacious. A murder of crows is not necessarily homicidal, and an unkindness of ravens is not necessarily hurtful or mean. Context matters. In defining willfulness to exclude a manufacturer who harbors "a good faith and reasonable belief" that it is complying with the Act, the word "reasonable" qualifies the nature of the manufacturer's "good

28

faith" "belief"; "reasonableness" separate and apart from the manufacturer's subjective belief is not a requirement of the exclusion, so objective unreasonableness separate and apart from the manufacturer's subjective belief is not a basis for finding conduct to be willful. This is why the definition of willfulness always looks to the party's *subjective* state of mind (*Robertson*, *supra*, 144 Cal.App.4th at p. 815 [error not to admit evidence of the manufacturer's "belief" in its compliance]; *Jensen*, *supra*, 35 Cal.App.4th at p. 136 [looking to the manufacturer's subjective state of mind]), which would not be the case if objective unreasonableness alone were relevant. And, more to the point, it is why a party can "act[] in good faith and with a reasonable belief . . . even where [it] was negligent or committed some error." (*Plate v. Sun-Diamond Growers* (1990) 225 Cal.App.3d 1115, 1124; *People v. Harris* (2015) 234 Cal.App.4th 671, 700 [same]; *Kwan*, *supra*, 23 Cal.App.4th at pp. 184-185 [violation of the Act due to an "honest mistake" is not willful].)

        e.      Nonaccidental violations of the Act

According to some California courts, a manufacturer acts willfully whenever it acts "intentionally"—that is, as long as the manufacturer "'knows what [it] is doing, intends to do what [it] is doing, and is a free agent.'" (*Suman*, *supra*, 23 Cal.App.4th at p. 12; *Ibrahim*, *supra*, 214 Cal.App.3d at p. 894; *Santana*, *supra*, 56 Cal.App.5th at p. 346.) We reject this standard, as it would entitle a consumer to a civil penalty whenever a manufacturer's noncompliance with the Act is merely nonaccidental. Because the decision whether to replace or repurchase a vehicle is necessarily *intentional*, this standard would make the Act's civil penalty available whenever the Act is simply violated. This would obliterate the two tiers of penalties under the Act, and

29

eliminate the punitive purpose of the civil penalty. At least one court has likewise rejected this overly permissive definition of willfulness. (*Kwan, supra*, 23 Cal.App.4th at p. 185 ["equat[ing] . . . willfulness with volition . . . would render 'willful' virtually all cases of refusal to replace or refund"].) We join *Kwan* in rejecting it.

### 2. *The pertinent window of time*

The inquiry into whether a manufacturer's conduct in "fail[ing] to comply" with the Act was "willful" necessarily focuses on a specific window of time.

The pertinent window *starts* once the consumer has presented a sufficiently nonconforming vehicle to an authorized "service or repair" facility and provided the manufacturer a "reasonable number of attempts" to fix that nonconformity (§ 1793.2, subd. (d)(2)), because only after the consumer has taken these steps is the manufacturer's duty under the Act to replace or repurchase triggered, and therefore, only then could there be a willful violation of the Act. This starting point also is dictated by the plain text of the Act itself: The Act's civil penalty provision focuses on whether the manufacturer's *violation of the Act* was willful (§ 1794, subd. (c)); conduct occurring *before* there was any violation is accordingly irrelevant.

The pertinent window *ends* once the consumer has invoked the right to sue under the Act. This end point is implied from the function of the Act's civil penalty—that is, to deter dilatory conduct by manufacturers and thereby to encourage the prompt replacement or repurchase of defective vehicles. (*Kwan, supra*, 23 Cal.App.4th at p. 185.) At the moment a consumer files suit, the deterrence and encouragement functions of the civil penalty provision have obviously failed. More to the point, allowing juries

to examine a manufacturer's conduct after litigation has commenced would undoubtedly place pressure on manufacturers to settle on terms favorable to the consumer, for settlement offers that fell short of what the consumer wants would end up in front of the jury as evidence of the manufacturer's willfulness. Only by recognizing an end point to the inquiry into willfulness is it possible to avoid turning the civil penalty into a Sword of Damocles that browbeats manufacturers into offering settlements containing every term on the consumer's litigation wishlist or else risk having the consumer's restitution award trebled. (See generally *Cowan v. Superior Court* (1996) 14 Cal.4th 367, 392 (conc. & dis. opn. of Brown, J.) ["A rule that creates . . . a perverse set of incentives is untenable"]; accord, *Bishop v. Hyundai Motor Am.* (1996) 44 Cal.App.4th 750, 760 (*Bishop*) [noting trial court's initial ruling excluding evidence of settlement offers made after litigation commenced].)

## B.   *Analysis*

In light of these principles, the pertinent question regarding the propriety of the civil penalty against Kia is whether Kia's violation of the Act was "willful"—that is, whether it was deliberate, knowing, or not based on a good faith and *reasonable* belief that it was complying with the Act during the 21-month window between Kia's second opportunity to repair the Optima in December 2014 and plaintiff's filing of his lawsuit in September 2016.

### 1.   *Grant of JNOV motion*

The trial court's order granting Kia's JNOV motion on the ground that the jury's willfulness finding was not supported by the evidence may be upheld only if there is *no* substantial evidence in the record that Kia's failure to comply with the Act

31

was deliberate, knowing, *or* not based on a good faith and reasonable belief that it was complying with the Act. After independently reviewing the evidence, we cannot uphold the trial court's order because there *is* substantial evidence to support the jury's finding that Kia knowingly violated the Act or did not perform under a good faith and reasonable belief that it was complying with the Act.[8]  Admittedly, the evidence as to whether Kia knew that plaintiff's Optima had a qualifying nonconformity was conflicting:  Plaintiff testified that the dealership mechanics personally witnessed the Optima's inability to move in reverse as plaintiff's December 2014 visit to the dealership was wrapping up, but the dealership's contemporaneous records reflect no such interaction with or revelation to the mechanics. However, because we must presume that the jury resolved this conflict in plaintiff's favor, there is substantial evidence that the dealership—and hence Kia—had verified the defect in plaintiff's Optima in December 2014 and yet did not offer to replace or repurchase his vehicle for another 14 months. This is why we disagree with the trial court's finding that there was "no substantial evidence that Kia knew that the [Optima] had a defect that it could not repair."

Kia makes three arguments in response.

First, Kia argues that it is improper to impute the dealership's knowledge of the defect to Kia because the dealership here is an independent franchisee and hence not an agent of Kia's from whom knowledge may be imputed. Citing

---

[8]     Because there is substantial evidence to support liability for the civil penalty on these bases, we need not examine whether there is substantial evidence to support a finding that Kia deliberately violated the Act.

*Ibrahim*, *supra*, 214 Cal.App.3d 878, plaintiff responds that a dealership's knowledge is *always* imputed to a manufacturer or distributor under the Act. Both parties are wrong. *Ibrahim* held it was appropriate to aggregate the number of opportunities to repair a vehicle no matter whether the facilities were owned by the manufacturer or by a dealer; it did not speak to the imputation of knowledge. (*Id.* at p. 889.) And while Kia is correct that the Act treats manufacturers, distributors, and retailers as distinct entities (compare § 1791, subd. (j) [defining "manufacturer"] with *id.*, subd. (e) [defining "distributor"] and with *id.*, subd. (*l*) [defining "retailer"]; *Kiluk v. Mercedes-Benz USA, LLC* (2019) 43 Cal.App.5th 334, 340 [noting "assumption baked into [the Act] is that the manufacturer and the distributor/retailer are distinct entities"]), and is correct that imputation of knowledge runs chiefly from agents to their principals (§ 2332 ["[a]s against a principal, both principal and agent are deemed to have notice of whatever either has notice of"]; *Tsasu LLC v. U.S. Bank Trust, N.A.* (2021) 62 Cal.App.5th 704, 724), these distinctions are not dispositive here because a manufacturer is not acting with a good faith and reasonable belief that it is complying with the Act—and hence it remains liable for the Act's civil penalty—if the manufacturer ignores "reasonably available information germane to [its] decision," which would include information available from the dealership that services vehicles on its behalf (*Kwan*, *supra*, 23 Cal.App.4th at pp. 185-186).

Second, Kia argues that there is no evidence that anyone, including the dealership mechanics, ever identified *the cause* of the defect with plaintiff's Optima. But this is not an element of a violation (*Mikhaeilpoor*, *supra*, 48 Cal.App.5th at p. 255), and for

33

good reason: In cases like this one, where there is a proverbial "ghost in the machine" that cannot be exorcized, the Act declares that the consumer is entitled to relief and places the onus on the manufacturer to replace or refund the accursed vehicle. The failure to do so violates the Act, and the "willful" failure to do so renders a manufacturer liable for the Act's civil penalty.

Third, Kia argues that it started to investigate the defect with plaintiff's vehicle soon after the December 2014 visit. But Kia's acquisition of knowledge of the defect after plaintiff previously reported that defect and gave Kia's authorized dealer two opportunities to repair it triggered its duty to replace or make restitution, not merely a duty to investigate. (§ 1793.2, subd. (d)(2)(A).)

### 2. *Grant of new trial motion*

The trial court's order granting a new trial on the issue of the civil penalty must be upheld as long as there is substantial evidence to support *the trial court's* finding that Kia did not "willfully" fail to comply with the Act or, put differently, as long as the record does not *compel* a finding that Kia's violation of the Act was willful. A manufacturer does not act willfully under the Act if it "reasonably believed the product *did* conform to the [express] warranty." (*Kwan*, *supra*, 23 Cal.App.4th at p. 185.) Here, and as noted above, the evidence as to whether Kia *knew* that plaintiff's Optima was defective was conflicting: Kia's contemporaneous records indicated that none of the dealership's mechanics had witnessed the vehicle's problems shifting into reverse, while plaintiff testified that they had. Acting as a thirteenth juror, the trial court was within its rights to resolve that conflict differently than the jury and thus to disbelieve plaintiff's testimony and to conclude that Kia did *not* ever verify

34

the existence of any defect with plaintiff's vehicle. This supports the trial court's finding that Kia harbored a good faith and reasonable belief that the Optima was not defective and hence conformed to the warranty, and that Kia's refusal to make a timely offer to repurchase the vehicle was not a willful violation of the Act. (Accord, *Dominguez v. American Suzuki Motor Corp.* (2008) 160 Cal.App.4th 53, 59 [manufacturer's refusal to offer to repurchase a motorcycle was not willful when it was "unable to replicate the [reported] problem"].)

What is more, there is substantial evidence supporting the trial court's implicit finding that Kia's good faith belief was reasonable because Kia adequately investigated the defect plaintiff reported: Kia's local repair facility (that is, the dealership) looked at the Optima once without finding a defect; Kia immediately thereafter called plaintiff three times to gather more information, but he ignored the calls; the dealership looked at the Optima a second time without finding a defect; when plaintiff called in January 2015 to demand a buyback, Kia arranged for one of its field technicians to examine the vehicle; the Kia field technician installed a flight recorder to collect data on the Optima's transmission for more than a month; Kia declined plaintiff's demand for a buyback only after examining the month's worth of data that indicated no malfunction; the dealership looked at the Optima two more times in late 2015, and both times could not replicate the problem; and Kia ultimately offered to buy back the Optima two months after the last attempt. This is not ostrich-like conduct.

Plaintiff raises a stampede of arguments that we have wrestled into five corrals.

35

First, plaintiff argues that the trial court's new trial order is procedurally defective and thus is void. To be sure, the statute governing the granting of new trials obligates a trial court to "specify" the statutory ground(s) for granting a new trial as well as the "reasons" for granting relief on those grounds (Code Civ. Proc., § 657), and the court's "reasons must refer to evidence, not ultimate facts" (*Oakland Raiders*, *supra*, 41 Cal.4th at pp. 633-635). Although "strict compliance" is required (*id.* at p. 634), unnecessary duplication is not: Trial courts are not required to "reiterat[e] what [they] ha[ve] already said at length" elsewhere in their posttrial orders, so a trial court's new trial ruling may "borrow" the findings the court made in support of its JNOV ruling. (*Lane*, *supra*, 22 Cal.4th at pp. 413, 415.) That is what happened here. The trial court's posttrial ruling set forth the correct thirteenth juror standard for assessing evidence on a new trial motion and, by granting a new trial in the alternative, borrowed from the court's earlier discussion in that same order of why it felt a JNOV was appropriate—namely, an absence of any evidence that Kia could confirm any defect with plaintiff's vehicle. Although that reason was not supported by the record using the prism applicable to granting JNOV motions, it was supported using the prism applicable to granting new trial motions.

Second, plaintiff makes several arguments that all suffer from the same underlying flaw—namely, they apply the wrong legal standard. Plaintiff asserts that Kia acted willfully as a matter of law because Kia "should have been able" to verify that the Optima was defective (and was negligent for not doing so), and because the 2019-made video provides that verification. But these assertions ignore that the correct definition of "willful"

36

conduct under the Act is not tied to the manufacturer's negligence and does not look at evidence of the manufacturer's conduct after litigation commences (which in this case was years before the video was created). Plaintiff asserts that the evidence at trial *supports* a finding that Kia was deliberately ignorant of any defect with the vehicle. But this assertion ignores that the pertinent question under our standard of review of an order granting a new trial is whether the evidence *compels* such a finding, and here it does not. Plaintiff asserts that Kia's inability to replicate the Optima's defect is not an automatic defense to a violation of the Act. This assertion is correct, but ignores that the inability to replicate can still support a finding that a violation was not willful because that inability can support a good faith and reasonable belief that there was no defect and hence no duty under the Act to replace or repurchase the seemingly nondefective vehicle.

Third, plaintiff argues that Kia's "endless" investigation into the defect with his Optima in the 21 months between its violation of the Act in December 2014 and plaintiff's lawsuit in September 2016 renders Kia's violation willful as a matter of law. It does not. If it did, manufacturers would be placed in the impossible position of being "damned if they do, and damned if they don't" because active investigation of a reported defect *and* the failure to actively investigate a reported defect would *both* constitute willful conduct subjecting a manufacturer to the Act's civil penalty. Because the civil penalty was not meant to be awarded for *every* violation, we reject a construction of the Act that would lead to that impermissible outcome.

Fourth, plaintiff argues that precedent mandates a ruling in his favor. It does not, as all the cases he cites are

distinguishable. The courts in *Schreidel v. American Honda Motor Co.* (1995) 34 Cal.App.4th 1242; *Figueroa*, *supra*, 84 Cal.App.5th 708; and *Jensen*, *supra*, 35 Cal.App.4th 112 all upheld a finding of a willful violation of the Act after the manufacturer was unable to duplicate the defect in the consumer's vehicle, but in each case the manufacturer made either "minimal" attempts to duplicate the defect, outright refused to investigate the defect at all, or had independent corroboration of the defect's existence. (*Schreidel*, at p. 1254 ["minimal" "attempt[s]" to duplicate]; *Figueroa*, at p. 715 [outright refusal]; *Jensen*, at pp. 136-137 [manufacturer issued "technical bulletin" alerting dealerships that the vehicle had specific defect at issue].) The courts in *Lukather v. General Motors, LLC* (2010) 181 Cal.App.4th 1041 and *Anderson*, *supra*, 74 Cal.App.5th 946 upheld a finding of a willful violation of the Act after the manufacturer had confirmed the defect in the vehicle but was unable to fix it. (*Lukather*, at pp. 1051-1052; *Anderson*, at pp. 953-954.) The court in *Oregel*, *supra*, 90 Cal.App.4th 1094 upheld a finding of a willful violation of the Act when the manufacturer's refusal to offer a replacement or repurchase was based on its "internal policies that erected hidden obstacles to the ability of an unwary consumer to obtain redress under the Act." (*Id.* at p. 1105.) In this case, the trial court sitting as a thirteenth juror had substantial evidence upon which to find that Kia had not independently corroborated the existence of a defect, that Kia had not otherwise confirmed the existence of a defect, and that Kia's decision to wait until February 2016 to offer to repurchase plaintiff's Optima was based on the facts of plaintiff's case rather than any internal policy aimed at confounding consumers' rights under the Act.

38

Fifth and lastly, plaintiff argues that the terms of Kia's February 2016 offer to repurchase his vehicle—which plaintiff pejoratively characterizes as "predatory"—establish the willfulness of Kia's violation of the Act as a matter of law. More particularly, plaintiff offers a two-part argument: He criticizes six specific terms of Kia's offer, and then he cites case law establishing that at least some of those terms are "unreasonable." We reject plaintiff's arguments for several reasons.

For starters, the cases he cites in support of the second step of his argument—chiefly, *Goglin v. BMW of North America, LLC* (2016) 4 Cal.App.5th 462 (*Goglin*); *McKenzie v. Ford Motor Co.* (2015) 238 Cal.App.4th 695 (*McKenzie*); *Gezalyan v. BMW of North America, LLC* (C.D. Cal. 2010) 697 F.Supp.2d 1168 (*Gezalyan*); and *Etcheson v. FCA US LLC* (2018) 30 Cal.App.5th 831 (*Etcheson*)—all arise in a different context, and do not support his argument that Kia's violation of the Act was willful. All of these cases address whether a consumer can recover attorney fees under the Act when those fees were incurred after the consumer's attorney rejected the manufacturer's offer to repurchase and when that offer contained, as proposed terms, either a release of liability or a confidentiality clause. (*Goglin*, at p. 472; *McKenzie*, at pp. 705-707; *Gezalyan*, at p. 1170; *Etcheson*, at pp. 845-846.) This is a different question than whether a manufacturer's inclusion of specific terms in an offer to repurchase a vehicle is *itself* evidence of that manufacturer's willful violation of the Act. Indeed, under the line of precedent plaintiff cites, a consumer can still recover attorney fees after their attorney rejects an offer to repurchase due to the offer's failure to include an extra payment akin to the Act's civil penalty. (*Etcheson*, at pp. 847-848.) If, as plaintiff urges, this line of

39

precedent applied here, a manufacturer's failure to offer to pay the Act's civil penalty in any repurchase offer would *itself* be evidence of willfulness that would, in turn, justify the imposition of the Act's civil penalty in subsequent litigation. Such sophistry is impressive but, for obvious reasons, is unpersuasive.

Next, we reject plaintiff's general premise that a manufacturer's offer to repurchase *itself* constitutes evidence of willfulness. Plaintiff asks: Why would a manufacturer offer to repurchase a vehicle unless it had done something wrong? This question completely ignores that the Act places an affirmative duty on manufacturers to make such offers and that this duty exists whether or not the manufacturer has done anything wrong. We therefore decline to construe a mandatory obligation imposed by the Act as conclusive evidence of willfulness entitling consumers to what effectively amounts to treble damages.

The six specific terms in Kia's February 2016 offer to repurchase that plaintiff finds offensive are neither sufficient nor compelling evidence of willfulness.[9]

The first three specific terms plaintiff attacks—namely, that Kia did not offer to pay plaintiff for (1) the $2,000 manufacturer's rebate, (2) the optional security device and optional service plan supplied by third parties, or (3) the full amount of his insurance premiums—are terms that plaintiff has conceded or that we have concluded are entirely proper under the Act, and hence cannot be considered evidence of a willful violation of the Act.

The fourth term plaintiff attacks is the offer's condition that plaintiff "sign[] [a] settlement release agreement." Plaintiff

---

[9] Thus, the fact that Kia's 2016 offer may have been a standard offer is not evidence of willfulness.

40

urges that no such agreement was attached to the February 2016 offer letter, and that it was inappropriate to ask plaintiff to sign a release without knowing its content. As between construing the offer letter as a demand that plaintiff agree to a release of liability sight unseen and construing the offer letter as the first step in a multistep settlement process that would include plaintiff having the opportunity to review a settlement agreement given to him in the future, the latter construction is more reasonable. More to the point, that latter construction is in no way inappropriate because one contract may anticipate the execution of future contracts (e.g., *City of Galt v. Cohen* (2017) 12 Cal.App.5th 367, 381) and because there is no reason to assume that the release Kia would propose would be unlawfully overbroad (*Covert v. FCA USA, LLC* (2022) 73 Cal.App.5th 821, 839 [rejecting notion an anticipated release would reach impermissibly broader than the claims at issue under the Act]; *Goodstein v. Bank of San Pedro* (1994) 27 Cal.App.4th 899, 907 [presuming that release would only permissibly reach the claims at issue in that case]; cf. *Valdez v. Seidner-Miller, Inc.* (2019) 33 Cal.App.5th 600, 615-616 (*Valdez*) [terms of release violated the Consumer Legal Remedies Act]; *Rheinhart v. Nissan North America, Inc.* (2023) 92 Cal.App.5th 1016, 1035-1036 [terms of release impermissibly sought to cover future rights under the Act]; *McKenzie, supra*, 238 Cal.App.4th at pp. 705-707 [release was "breathtakingly broad"]; *Goglin, supra*, 4 Cal.App.5th at pp. 471-472 [release was a "general release" covering all future litigation]; *Gezalyan, supra*, 697 F.Supp.2d at p. 1170 [same]; *Etcheson, supra*, 30 Cal.App.5th at pp. 845-846 [requirement of release in first offer replaced with an "insufficiently specific" release in second offer]).

41

The fifth term plaintiff attacks is the requirement that Kia conduct a "physical inspection of the vehicle" for "excessive wear and tear" and that plaintiff provide a blank cashier's check by which Kia could offset the amount of any such excessive wear and tear. The offset for excessive wear and tear is not problematic, let alone evidence of willfulness. Although a consumer acts as a bailee of sorts for the manufacturer once the manufacturer has failed to comply with the Act (which is why postbreach insurance premiums protecting against property damage are recoverable as "incidental damages"), the consumer may still *use* the vehicle and the consumer is accordingly not liable for diminution in value due to normal wear and tear. However, *excessive* wear and tear goes beyond such ordinary use of the asset in the consumer's care and may therefore be offset. (Accord, *Jiagbogu*, *supra*, 118 Cal.App.4th at p. 1244 ["deliberate vandalism by a [consumer] . . . may well justify a defense to the [consumer's] claim"]; cf. *Valdez*, *supra*, 33 Cal.App.5th at pp. 615-616 [offset for "normal wear and tear" not permitted under the Consumer Legal Remedies Act]; *MacQuiddy v. Mercedes-Benz USA, LLC* (2015) 233 Cal.App.4th 1036, 1049-1050 [offer that required offset for "normal wear and tear" is too "uncertain[]" to constitute a firm offer under Code of Civil Procedure section 998].) The mechanism in Kia's offer for providing the offset, through the use of a cashier's check, is also not problematic, especially where, as here, the record indicates that the vehicle had no dents or dings or damage in February 2016.

The sixth term plaintiff attacks is that Kia's offset for 1,533 miles on the odometer prior to plaintiff's first August 2014 visit to the dealership impermissibly included the 19 miles on the odometer at the time plaintiff first purchased the Optima. Even

42

if we assume this was an error under the Act (although the Act does not expressly provide for this carve out (§ 1793.2, subd. (d)(2)), any such error translates to a $7.79 overcharge which is too de minimis to support, let alone compel, a finding that Kia willfully violated the Act.

      3.    *Scope of new trial*

      The new trial on the issue of whether Kia willfully violated the Act should be conducted on remand subject to the guardrails clarified in this opinion. Specifically, the scope of evidence relevant to willfulness does not include Kia's conduct outside the pertinent window of time identified in this opinion (that is, the relevant scope includes only the 21 months between Kia's violation in December 2014 and plaintiff's lawsuit in September 2016),[10] and in assessing the evidence adduced at the new trial, the jury should be instructed, consistent with this opinion, that Kia's violation of the Act was "willful" for purposes of the civil penalty only if Kia's failure to comply was deliberate, knowing, or not based on a good faith and reasonable belief that it was complying with the Act. In the event the jury makes the necessary willfulness finding, the civil penalty imposed "shall not exceed two times" the amount of the "restitution" award as amended consistent with this opinion.

---

**10**    We further note that while plaintiff testified at the first trial to his personal feelings about how Kia's conduct affected plaintiff or his family, such evidence would not be relevant at the new trial on willfulness as such testimony injects emotional distress-type damages into the dispute, which are not recoverable under the Act. (*Kwan, supra,* 23 Cal.App.4th at p. 192; *Bishop, supra,* 44 Cal.App.4th at pp. 757-758; *Erlich v. Menezes* (1999) 21 Cal.4th 543, 558.)

**DISPOSITION**

The judgment is affirmed in part and reversed in part, and the trial court is directed to strike from plaintiff's "restitution" award the amounts set forth in this opinion and to conduct a new trial consistent with this opinion on the issue of the civil penalty. The parties are to bear their own costs on appeal.

**<u>CERTIFIED FOR PUBLICATION</u>**.

_____, J.
HOFFSTADT

We concur:

_____, Acting P. J.
ASHMANN-GERST

_____, J.
CHAVEZ

44